**MONTREAL SECURITIES, INC.**
v.
**The UNITED STATES.**
No. 241–62.

United States Court of Claims.
March 13, 1964.

Carl L. Shipley, Washington, D. C., for plaintiff. Shipley, Akerman & Pickett, Washington, D. C., of counsel.

William L. Davis, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

This is another in the long series of suits by dissatisfied purchasers of surplus Government property. Montreal Securities, Inc., was the successful bidder in a sale by the Federal Housing Administration (FHA) of two rental housing projects. After the closing, many of the tenants moved out of the buildings and it appeared that plaintiff had made a poor bargain. It seeks a restoration of the money it paid for the purchase.

The FHA had insured the mortgages of two rental housing projects—known collectively as The Manor Apartments, in Williston, North Dakota—under Title IX of the National Housing Act, 65 Stat. 295–302 (1951), as amended, 12 U.S.C. § 1750 et seq. Later, FHA became the owner of the properties through foreclosure. In April 1961, it issued a "Prospectus and Invitation to Bid" advertising the sale of the two projects. The information in this circular included a general description of The Manor Apartments, the minimum price the agency would accept ($165,000), the maximum mortgage it would take ($150,000), and the required cash deposit with the bid ($10,000). Also set forth were the rents fixed by the FHA and the percentage of occupancy of each of the projects for a preceding ten or twelve-month period. Williston Manor, having 54 rental units, was said to have the following percentages of occupancy:

| 1960 | Percent | 1961 | Percent |
|---|---|---|---|
| March | 80 | January | 83 |
| April | 83 | February | 77 |
| May | 80 | | |
| June | 80 | | |
| July | 86 | | |
| August | 63 | | |
| September | 83 | | |
| October | 83 | | |
| November | 80 | | |
| December | 80 | | |

Northwestern Manor, with only 12 rental units, was shown as having these percentages:

| 1960 | Percent | 1961 | Percent |
|---|---|---|---|
| May | 92 | January | 92 |
| June | 83 | February | 86 |
| July | 92 | | |
| August | 83 | | |
| September | 83 | | |
| October | 91 | | |
| November | 100 | | |
| December | 100 | | |

This disclaimer was also a part of the prospectus:

" * * * Information provided herein is all that is to be made available by FHA. While care has been exercised to assure accuracy, all information herein is provided solely for permitting parties to de-

termine whether or not the property is of such a type and general character as might interest them in purchase. Those interested are expected to acquaint themselves with the property and to arrive at their own conclusions as to physical condition, number and occupancy of revenue producing units, and any factors bearing upon valuation of the property.

## FHA MAKES NO WARRANTY AS TO THE ACCURACY OF ANY INFORMATION FURNISHED."

Plaintiff offered a bid of $170,275, which was accepted. The formal contract provided that plaintiff was to pay $10,000 immediately and that the balance of the purchase price ($10,275 in cash and a $150,000 note secured by a mortgage and chattel mortgage) was to be paid at or prior to the closing. The agreement also required that Montreal Securities (a New York corporation) take title in the name of a North Dakota corporation to be set up for that purpose. Accordingly, on July 28, 1961, plaintiff assigned the contract to Lincoln Apartments, Inc., its wholly-owned subsidiary and North Dakota nominee for the taking of title. On October 25, 1961, the sale was consummated in a closing at which title was passed to Lincoln Apartments which, in turn, gave the FHA its note secured by a mortgage and chattel mortgage.

Shortly afterwards, occupancy of the rental facilities declined to only 25% of capacity. A mortage installment due February 1, 1962, was not paid and none of the succeeding installments was forthcoming. On May 20, 1962, plaintiff notified the FHA that it rescinded the transaction and that it wished the $20,275 which it had paid to be returned. The agency refused and plaintiff brought this suit.[1] In the meanwhile, the FHA had reacquired the properties by foreclosure of the mortgages.

Plaintiff does not contend that the information in the "Prospectus and Invitation to Bid" was false so far as that material went; plaintiff maintains, rather, that it was misled by the information into concluding that the projects had permanent tenants and that occupancy was constant. But here, as in so many previous cases, the bidder was warned that the selling agency did not warrant the accuracy of any information furnished; he was expressly told that if he was interested he should acquaint himself with the property and arrive at his own conclusions as to "physical condition, number and occupancy of revenue producing units, and any factors bearing upon valuation of the property." In the face of these cautions and disclaimers, the plaintiff could not rely on the inferences it drew from the true information given by the FHA. It had to make and rely on its own judgments. This is the consistent teaching of the decisions dealing with comparable sales by the defendant of property which is surplus to its needs. See, e. g., Alloys & Chems. Corp. v. United States, Ct.Cl., 324 F.2d 509; American Auto Parts Co., Inc. v. United States, Ct.Cl., No. 120–57, decided June 7, 1963, and cases cited at slip op., p. 5.[2]

---

1. Defendant has argued that Montreal Securities is not the proper party to bring this suit; it says that Lincoln Apartments should be the plaintiff. The cash consideration actually passed from Montreal Securities and that is all plaintiff asks for in this suit. Moreover, Lincoln Apartments is plaintiff's wholly-owned subsidiary and plaintiff's attorney assured us on oral argument that Montreal Securities was the only interested party. We take that to be an admission by Lincoln Apartments that it has no claim against defendant. For these reasons,

and in view of our disposition of the merits of the case, we have not required that Lincoln Apartments be formally joined.

2. This is not a case, like Krupp v. Federal Housing Administration, 285 F.2d 833 (C.A.1, 1961), in which the selling agency flatly misstated a positive known fact concerning the property (i. e., the number of garage spaces available). There was no such misstatement here— no misdescription of the property. The Krupp opinion, interpreting a prospectus

The abrupt statement in the prospectus that the FHA would furnish no other information does not take this case outside the general rule. Plaintiff was not barred from speaking to the tenants, studying local business and industrial conditions, or making its own inquiries. The principle that the buyer must look out for himself has been followed, where bidders are cautioned to make their own inspections, even in cases in which inspection was impossible or much more difficult than here. Alloys & Chems. Corp. v. United States, supra; American Auto Parts Co., Inc. v. United States, supra; Star Woolen Co. v. United States, Ct.Cl., 309 F.2d 409; United States v. Hathaway, 242 F.2d 897, 900 (C.A.9, 1957).[3]

Plaintiff's major effort to escape the guillotine of *caveat emptor* is the argument that the FHA, unlike other selling agencies, has been required by Congress to warrant the soundness of property such as The Manor Apartments. The FHA, plaintiff insists, could not insure or accept a mortgage on these projects unless the property met the statutory standard of being "economically sound"; plaintiff then says that the same standard governed the sale of the projects after foreclosure, and that it relied on this criterion in bidding on and buying the apartments. Since the purchase turned out to be an unsound investment, it is said that there was either a breach of an implied warranty of economic soundness or a material mistake as to that factor.

There are two main refutations of this contention. The first is that the standard of "economic soundness" never applied to The Manor Apartments. When those projects were built, the FHA insured the original mortgages, not under Title II of the National Housing Act, but under Title IX. This latter title was added to ameliorate the shortage of housing and community facilities made especially severe by the shifting of manpower for defense purposes as a result of the Korean hostilities. H.R. Rep. No. 795, 82d Cong., 1st Sess. (1951). It was "designed to supplement systems of mortgage insurance under other provisions of the National Housing Act in order to assist in providing adequate housing in areas which the President * * * shall have determined to be critical defense housing areas." 65 Stat. 296 (1951), 12 U.S.C. § 1750b. Unlike Title II, which requires that the Commissioner of the Federal Housing Administration make a finding that rental housing of the kind involved here be "economically sound" (12 U.S.C. § 1713(c)), Title IX, section 903, sets up the far less strict standard that the property be an "acceptable risk in view of the needs of national defense." 65 Stat. 298 (1951), 12 U.S.C. § 1750b(c).[4] There is not the slightest reason to doubt that the projects complied with this minimal requirement.

similar to that used in this case, thought that the disclaimers were addressed "to additional information which would be useful in predicting the earning potential of the property" (id. at 836). That is more nearly our situation.

3. In any event, we find little in the prospectus which would reasonably cause plaintiff to come to the conclusion it now says it reached. On the contrary, the furnished information indicates that there was a considerable variation in the percentage of occupancy. The figures showed that for a twelve-month period occupancy ranged, for Williston Manor (54 apartments), from 63 to 86%; in February 1961, the last month given, occupancy was 77%. As for Northwestern Manor (12 apartments), the prospectus showed that it ranged in occupancy from 83 to 100%. The variations were enough to put a reasonable bidder on notice to inquire further.

4. H.R.Rep. No. 795, supra, at 9, points out the standard of "acceptable risk" and adds: "This language would permit the FHA to underwrite projects which might not meet the long-term normal criteria of economic soundness, especially as to location and continued marketability, which are required under the regular FHA program." The report also refers to "[t]his deviation from the economic soundness requirement" and to the fact that projects under the new title would be "admittedly more risky than would be acceptable under a long-term peacetime program of mortgage insurance." U.S.Code Cong. & Adm.Service 1951, p. 1722.

The second, and more conclusive, answer is that neither the acceptability level set up by Title II ("economically sound") nor that of Title IX ("acceptable risk in view of the needs of national defense") applies to sales by the FHA of foreclosed property. Those standards are important only where the FHA insures a mortgage in the first instance, not where the agency has acquired the property through foreclosure and then sells it. Entirely different provisions of Title IX and Title II specifically cover the disposal of property by the FHA. While the authority to insure mortgages under Title IX had expired when the two rental housing projects were sold to plaintiff,[5] the remaining portions of that title, relating to foreclosure, disposal of property, etc., remained (and still remain) in force. Section 904(f) of Title IX, 65 Stat. 300 (1951), 12 U.S.C. § 1750c(f), provides in pertinent part:

> "Notwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, the Commissioner [of the FHA] shall have power to deal with, complete, rent, renovate, modernize, insure, make contracts or establish suitable agencies for the management of, or sell for cash or credit, in his discretion, any properties conveyed to him in exchange for debentures and certificates of claim * * *."

This section grants to the Commissioner very broad powers with respect to the disposal of property. There are no such limiting requirements as plaintiff invokes. It seemed logical to Congress that when property was acquired because of the failure of the owner to meet payments and expenses the FHA should not be hampered by standards of "economic soundness" or "acceptable risk" when it attempted to resell. Where the agency is the seller and it takes a purchase-money mortgage, as here, the statute sets up no such standard; the FHA is simply a vendor having no more obligation, in the main, than would the private seller of realty. And if we assume that section 904 is no longer in effect, then the companion section 207(l) of Title II would be applicable to the multi-family rental housing involved in this case.[6]

The defendant's cross-motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied. The petition is dismissed.

---

5. The authority to insure mortgages under Title IX (with certain irrelevant exceptions) expired as of August 1, 1954. 65 Stat. 295 (1951), as amended, 67 Stat. 125 (1953), 42 U.S.C. § 1591c.

6. Section 207(l) reads:
"Notwithstanding any other provisions of law relating to the acquisition, handling, or disposal of real and other property by the United States, the Commissioner shall also have the power, for the protection of the interests of the Housing Fund, * * * to deal with, complete, reconstruct, rent, renovate, modernize, insure, make contracts for the management of, or establish suitable agencies for the management of, or sell for cash or credit or lease in his discretion, any property acquired by him * * *."