Kamran NEMATOLLAHI and Tracy Nematollahi, individually and on behalf of their children, Hamid Nematollahi and Iman Nematollahi

v.

UNITED STATES.

No. 95–824C.

United States Court of Federal Claims.

March 7, 1997.*

Reissued for Publication
July 8, 1997.

---

* This Opinion was filed unpublished on March 7, 1997. Thereafter, the defendant filed a Request for Publication pursuant to this Court's Rule 52.1(b). This request has now been allowed, and the Opinion is reissued for publication this date, July 8, 1997.

Kevin S. Hannon, Denver, CO, for plaintiffs.

Steven E. Gordon, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Kenneth K. Roland, U.S. Department of Housing and Urban Development, of counsel.

## OPINION

YOCK, Judge.

This contract action comes before the Court on the Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). The plaintiffs' Complaint seeks damages based on claims of contractual misrepresentation, unilateral mistake, and unjust enrichment arising out of the plaintiffs' purchase of residential real estate from the United States Department of Housing and Urban Development (HUD) that contained contaminated well water.

After a full and careful examination of the pleadings, briefs, and submissions filed by the parties, the Court grants the Defendant's Motion for Summary Judgment.

### Factual Background

In or around August 1959, the Federal Government conducted a study and a report was compiled by the Robert A. Taft Sanitary Engineering Center, Cincinnati, Ohio, concerning the quality of ground water in certain parts of the State of Colorado. The report, Public Health Aspects of the Contamination of Ground Water in South Platte River Basin in Vicinity of Henderson, Colorado, examined the contamination of ground water at the Rocky Mountain Arsenal (RMA or Arsenal) and its vicinity.

From the available information, particularly the reports prepared by the U.S. Geological Survey and the University of Colorado, it is concluded that a portion of the shallow ground water aquifer in the area between Derby and Henderson is contaminated, and that wastes discharged from the Rocky Mountain Arsenal throughout the period 1943 to 1955 are a principal source of such contamination. Furthermore, sludge, which accumulated in the holding pond used during that period, may be the source of continuing contamination.

\* \* \* \* \* \*

Available information is that there have been no authenticated cases of illness in the area which can be attributed to the contaminated water. However, the consumption of water over a period of 2 or 3 months containing appreciable amounts of one of these contaminants could adversely affect an individual's health. Tentative maximum permissible limits for drinking and culinary water have been suggested by the Public Health Service. \* \* \* It should be recognized that permissible limits are aimed at protecting the more susceptible individuals and that the average person

might consume water containing somewhat higher concentrations without injury to health.

\* \* \* \* \* \*

No information is available on the course and rate of flow of the contaminated water arriving in the vicinity of the South Platte River. Some of this water may rise to the surface. Any contaminated ground water reaching this vicinity which does not flow into the river would be expected to move in a northeast-wardly direction toward Brighton. The concentration of the chlorides will be reduced by dilution only; those of the chlorates and other substances may or may not be reduced by still other physical, chemical and biological processes.

\* \* \* \* \* \*

All domestic water supplies from both shallow and deep wells drawing water from within the contaminated area should be checked for conductivity or chlorides, and all such waters showing conductivity or chloride concentrations in excess of 200 mg/l should be examined to determine whether chlorates, 2, 4–D, or other contaminants exceed the maximum permissible limits for potable water.

Report at 2–3, 15, 18.

In addition, an EPA Abstract of the RMA, dated June 4, 1987, described the state of the contaminants located at the RMA and its vicinity.

THE ROCKY MOUNTAIN ARSENAL (RMA) IS A FACILITY OWNED AND OPERATED BY THE UNITED STATES DEPARTMENT OF THE ARMY. IT WAS ESTABLISHED IN 1942 WITH THE PRIMARY MISSION OF MANUFACTURING AND ASSEMBLING CHEMICAL AND INCENDIARY MUNITIONS TO SUPPORT THE WAR EFFORT. AFTERWARDS, PESTICIDES AND HERBICIDES WERE PRODUCED ON–POST BY PRIVATE LEASES. MANY OF THESE SUBSTANCES, THEIR BY–PRODUCTS AND RESIDUES WERE LATER DISPOSED OF ON–POST. THE RMA OFF–POST SITE IS LOCATED NORTHEAST OF DOWNTOWN DENVER, COLORADO, ADJACENT TO RMA. THE AREA IS NEARLY COMPLETELY DEVELOPED WITH RESIDENTIAL SUBDIVISIONS, INDUSTRIAL FACILITIES AND GRAVEL OPERATIONS. SOUTH ADAMS COUNTY WATER AND SANITATION DISTRICT (SACWSD) WAS CREATED IN 1953 TO SUPPLY APPROXIMATELY 30,000 CUSTOMERS WITH WELL WATER FROM THE ALLUVIUM AND BEDROCK. RECENT STUDIES BY EPA AND SACWSD INDICATE THAT SIGNIFICANT CONCENTRATIONS OF ORGANIC SOLVENTS ARE PRESENT IN THE LOCAL AND REGIONAL GROUND WATER SYSTEM WHICH IS THE MAIN SOURCE OF DRINKING WATER FOR SACWSD. THIS OPERABLE UNIT ADDRESSES TREATMENT OR REPLACEMENT OF CONTAMINATED GROUND WATER WITHIN THE RMA OFF–POST SITE PRIOR TO ITS USE AS DRINKING WATER BY CUSTOMERS OF THE SACWSD. THE HAZARDOUS SUBSTANCES OF PRIMARY CONCERN PRESENT IN THE GROUND WATER SUPPLYING THE SACWSD WELLS INCLUDE: TRICHLOROETHYLENE (TCE), TETRACHLOROETHYLENE (PCE), 1, 1, 1–TRICHLOROETHANE, 1, 1–DICHLOROETHANE, 1, 1–DICHLOROETHYLENE. AND TRANS–1, 2–DICHLOROETHYLENE. OTHER VOLATILE, SEMI–VOLATILE, AND NON–VOLATILE ORGANIC COMPOUNDS ARE PRESENT IN THE GROUND WATER IN AREAS ADJACENT TO THE UPGRADIENT OF RMA OFF–POST SITE, BUT HAVE NOT BEEN DETECTED IN SACWSD SUPPLY WELLS TO DATE. VINYL CHLORIDE HAS ALSO BEEN DETECTED UPGRADIENT FROM THE SACWSD WELLS.

In December 1988, at the request of the U.S. Army Program Manager's Office for Rocky Mountain Arsenal, Environmental Science and Engineering, Inc., prepared a Remedial Investigation and Chemical Specific Applicable or Relevant and Appropriate Requirements Final Report, which evaluated the nature and extent of contamination that may

have resulted from contaminant migration from the RMA.

On or about July 7, 1992, the plaintiffs, Kamran and Tracy Nematollahi (the Nematollahis), signed a sales contract and addenda with HUD to purchase a house located at 11285 124th Avenue East, Brighton, Colorado (the property), which is located approximately seven miles northeast of the RMA. HUD signed the contract and addenda on or about July 9, 1992. The contract contained various "Conditions of Sale," which in part, stated that:

> B. *Seller makes no representations or warranties concering* [sic] *the condition of the property,* including but not limited to mechanical systems, dry basement, foundation, structural, or compliance with code, zoning or building requirements and will make no repairs to the property after execution of this contract. *Purchaser agrees to accept the property in the condition existing on the date of this contract and acknowledges responsibility for satisfying itself as to the full condition of the property* and of laws, regulations and ordinances affecting the property.
>
> \* \* \* \* \* \*
>
> O. *This contract contains the final and entire agreement between Purchaser and Seller and they shall not be bound by any terms, conditions, statements, or representations, oral or written, not contained in this contract.* [Emphasis added.]

Contract at 2.

Included in the addenda to the sales contract was an as-is agreement signed by the plaintiffs:

> The sales contract you are to execute contains a provision on the reverse side of Page 1 which warns you that *this property is sold 'AS–IS.' You must assure yourself that its condition is acceptable for your needs as it exists today.*
>
> If you are uncertain about the condition of the property, you should have it inspected by a professional inspector. We permit a contract contingency clause for such an inspection. The real estate agent through whom you are submitting the offer can provide you with the form necessary for this contingency.
>
> *DO NOT ASSUME THAT THE PROPERTY IS IN ACCEPTABLE CONDITION!* If you find that repairs are needed, **YOU MUST MAKE THEM AT YOUR OWN EXPENSE, AFTER CLOSING THE SALE. HUD WILL NOT PAY FOR ANY REPAIRS TO THIS HOME.** I HAVE READ THE INFORMATION ABOVE AND I UNDERSTAND IT COMPLETELY. [Emphasis added.]

In addition to the as-is agreement, the plaintiffs executed a Professional Property Inspection Addendum, which stated that:

> This contract is specifically contingent upon the professional inspection and approval of the major operating systems of the property. Said inspection shall be at Purchaser's expense. Major operating systems shall be defined as the structural, plumbing, electrical, heating and air conditioning (if any) systems and the roof. No representation as to the condition of the property with respect to the major operating systems is made by HUD, its sub-agents or employees unless such representation is disclosed to the Purchaser in writing.
>
> \* \* \* \* \* \*
>
> Regardless of the outcome of the inspection, if the Purchaser does not cancel the contract as indicated above, the Purchaser accepts the property and its appurtenances in "AS–IS" condition.
>
> Purchaser agrees to rely only upon those representatives who Purchaser may engage to conduct the inspection. Purchaser may not rely upon any representatives HUD, HUD's agents, sub-agents or employees unless such representations are received in writing directly from HUD, HUD's agents, sub-agents or employees acting in their official capacity. It shall be the sole duty and responsibility of the Purchaser to order, conduct and pay for the professional inspection by representatives of the Purchaser's choosing.

According to the plaintiffs, after signing the contract but before closing, they noticed that a neighbor in the area of their new house was receiving bottled water, and inquired of Mr. Rod Foster, the real estate broker listed on their sales contract, about this matter.[1] The plaintiffs asked Mr. Foster about the quality of the water in general, and Mr. Foster offered[2] to arrange for the testing of the water located on the property.[3] At the conclusion of the test, Mr. Foster allegedly informed the plaintiffs that the water was "a little hard" but otherwise safe. Aff. of Mr. Kamran Nematollahi at 2. The closing of the property took place on or about September 18, 1992, at which time the plaintiffs were provided a copy of the results of the water test that was arranged by Mr. Foster.

In December 1993, representatives from the Tri–County Health Department informed the plaintiffs that their well water contained relatively high, unsafe levels of nitrates. Thereafter, the plaintiffs purchased a water filtration system and received bottled water from the State of Colorado because the water in their well was unsafe to drink. In December 1995, the plaintiffs sold their property located at 11285 124th Avenue East, Brighton, Colorado.

On or about December 14, 1995, the plaintiffs filed the present Complaint in this Court. In their Complaint, the plaintiffs set forth monetary claims based on theories of contractual misrepresentation, unilateral mistake, and unjust enrichment arising out of the presence of several hazardous contaminants in the water supply located on the property that the plaintiffs purchased from HUD. Based on their claims, the plaintiffs seek a declaratory judgment ordering the following relief: (1) the amount of the decrease in the value of the property due to the contamination; (2) the loss of use and value of the monies obtained by the plaintiffs from the delayed sale of the property due to the contamination; (3) treatment and response costs; (4) statutory interest; (5) court costs, expert witness fees, and deposition expenses; (6) settlement costs paid by the plaintiffs at the purchase of the property; (7) restitution for profits made by the defendant due to its wrongful acts; (8) declaratory relief for indemnity for the proximate and foreseeable consequences of the defendant's actions; and (9) other just and proper relief.

*Discussion*

In its Motion for Summary Judgment, filed on April 1, 1996, the defendant contends that it is entitled to summary judgment on the plaintiffs' contractual misrepresentation claim because the contract expressly stated that HUD was not making any representations or warranties relating to the condition of the property. Specifically, the defendant asserts that the plaintiffs have not alleged facts that would prove that: (1) HUD or its representatives made a misrepresentation, (2) the purported misrepresentation was fraudulent or material, (3) the purported misrepresentation induced the plaintiffs to enter into the contract, and (4) the plaintiffs were justified in relying on the purported misrepresentation. In addition, the defendant contends that it is entitled to summary judgment on the plaintiffs' unilateral mistake claim because the sales contract allocated the risk of any mistake to the plaintiffs via the various contractual disclaimers. Finally, the defendant argues that it is entitled to summary judgment on the plaintiffs' unjust enrichment claim because the Complaint is based upon the alleged breach of an express contract, not an implied contract.

The plaintiffs counter that summary judgment in favor of the defendant is not appro-

---

1. The plaintiffs also contacted the Tri–County Health Department regarding the safety of the water located on the property, and a health department representative recommended that the plaintiffs obtain a test for Di–Isopropyhnethylphosphonate (DIMP).

2. While the plaintiffs contend that Mr. Foster offered to arrange for the testing of the well water on the plaintiffs' property, the defendant

contends that the plaintiffs specifically requested that a test be conducted. However, which party initiated the test is, alone, irrelevant to the parties' respective rights and responsibilities under the contract.

3. All of the water to be used for household purposes was provided by a well located on the premises.

priate at this time because there are genuine issues of material fact as to whether or not the defendant made misrepresentations concerning the quality of the ground water at the time that the plaintiffs purchased the property from HUD. In addition, the plaintiffs argue that there is a genuine issue of material fact as to whether or not Mr. Foster had the authority to make representations about the quality of the ground water on behalf of HUD. The plaintiffs posit that the various disclaimers in the sales contract and addenda, by their plain language, do not necessarily preclude a finding of liability on the part of the Federal Government with regard to the contaminated ground water alleged in their Complaint. With regard to its unilateral mistake claim, the plaintiffs contend that summary judgment is not proper because there is no contract language that allocates the risk of loss regarding contaminated ground water to the plaintiffs. Finally, the plaintiffs contend that summary judgment is not appropriate on the unjust enrichment claim because there are questions of fact whether or not an implied-in-fact contract exists based on the representations of the Government's agents.

Summary judgment is properly granted when there are no genuine issues of material fact, RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986), and the movant is entitled to judgment as a matter of law, RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). For a dispute over a material fact to be "genuine," the evidence must be such that it could cause a reasonable

trier of fact to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. In deciding a motion for summary judgment, all of the facts must be construed in a light most favorable to the nonmoving party, with all reasonable inferences drawn in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Once a movant has supported its motion with affidavits or other evidence that would establish its right to summary judgment, the nonmovant must respond with countering evidence sufficient to create a genuine issue. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). In countering a motion for summary judgment, the nonmovant cannot rest on mere denials and self-serving conclusions, unsupported by specific facts contained in the record. *Sweats Fashions, Inc.*, 833 F.2d at 1562; *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

▮ In this action, the resolution of the plaintiffs' claims will be determined by this Court's interpretation of the sales contract and addenda. As contract interpretation issues, such as those posed here, are matters of law, they are well suited for resolution by summary judgment. *Stone Forest Indus., Inc. v. United States*, 32 Fed.Cl. 424, 426 (1994); *Seaboard Lumber Co. v. United States*, 19 Cl.Ct. 310, 314 (1990); *Hendricks v. United States*, 10 Cl.Ct. 703, 706 (1986). Moreover, there are no genuine issues of material fact to be resolved. Therefore, this action is ripe for summary disposition.[4]

---

4. Despite the plaintiffs' arguments to the contrary, in deciding the Defendant's Motion for Summary Judgment, this Court will rely on federal common law to resolve the issues before this Court. The crux of the plaintiffs' argument is that this case involves a dispute as to the nature and extent of the real estate conveyed by the defendant, and, thus, the State of Colorado has a significant interest in applying its own law to the issues. However, as this Court stated previously in *Pinewood Realty Ltd. Partnership v. United States*, 223 Ct.Cl. 98, 102, 617 F.2d 211, 213–14 (1980):

> There is no question in the present case as to the extent of the property interest conveyed by HUD to plaintiff, but merely as to the rights

and obligations of the parties under a contract with the federal government. Such contracts are normally governed by a uniform federal law and not by the particular laws of the states where they are made or performed, except in most unusual circumstances.

There is no dispute that the sales contract executed by the parties conveyed to the plaintiffs the property located at 11285 124th Avenue East, Brighton, Colorado, in fee simple. Thus, there is no question regarding the "extent of the property interest conveyed." *See id.* Therefore, federal common law applies to determine the parties' rights and obligations as to the contaminated well water discovered on the property.

## A. Contractual Misrepresentation

■ In their first claim for relief, the plaintiffs allege that the defendant "contractually failed to disclose * * * material facts concerning the existence, nature, magnitude and effects of the Hazardous Contaminants in the ground water of the Property." Compl. at 3. Moreover, according to the plaintiffs, the defendant misrepresented the true facts concerning the contamination "with the intention of creating a false impression of the actual facts in the minds of Plaintiffs, and with the intent that Plaintiffs be induced into purchasing the Property * * *." *Id.* Finally, the plaintiffs claim that they reasonably relied on such representations by the defendant and sustained losses as a direct and proximate result.

■ In its motion for summary judgment, the defendant contends that it is entitled to judgment as a matter of law because HUD or its agents could not legally make any representations when the contract expressly disclaimed any "representations or warranties concering [sic] the condition of the property * * *." Contract at 2. Moreover, the defendant alleges that the plaintiffs were not *justified* in relying on any purported representations because of the sweeping disclaimers.[5] In its opposition to summary judgment, the plaintiffs counter that there are genuine issues of material fact as to whether or not the defendant actually made any misrepresentations as to the quality of the water and as to whether or not the contractual disclaimers encompass representations or warranties regarding the quality of the water.

■ To recover under a theory of contractual misrepresentation, a plaintiff must prove that:

(1) defendant made a misrepresentation; (2) the misrepresentation was either fraudulent or material; (3) the misrepresentation induced plaintiff to enter into the contract; and (4) plaintiff was justified in relying on the misrepresentation. Restatement § 164.

*Morris,* 33 Fed.Cl. at 745. The remedy for a finding of misrepresentation is rescission or reformation of the contract. *See id.* at 744 n. 9. However, this Court has never permitted plaintiffs to recover for alleged misrepresentations of fact where any warranty or representations were expressly disclaimed. *Id.*

In this regard, the plaintiffs fail to meet the first element that the defendant made a misrepresentation. It is a fundamental concept of law regarding contracts with the Federal Government that the Government will not be bound by the representations of its agent unless that agent had the actual authority to make such representations. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947). Moreover, the "plaintiff has the burden of

---

5. In addition to requesting summary judgment, the defendant argues for the first time in its reply that this Court lacks jurisdiction over the plaintiffs' Complaint to the extent that the plaintiffs claim that HUD failed to provide information related to the contamination because HUD did not have any contractual obligation to provide such information. The defendant avers that such a noncontractual claim sounds not in contract, but in tort, over which this Court does not have jurisdiction. The plaintiffs reply that this Court has jurisdiction because they have properly pleaded a breach of contract by the defendant and have met the requirements of the Tucker Act.

Pursuant to the Tucker Act, this Court does not have jurisdiction to entertain claims sounding in tort. 28 U.S.C. § 1491(a)(1) (1994). This Court, however, does have jurisdiction to hear monetary claims arising out of a contract with the Federal Government. *Id.; see also Morris v. United States,* 33 Fed.Cl. 733, 742 (1995). In this case, the plaintiffs complain that the defendant contractually misrepresented the quality of the prop-

erty's ground water and/or that the plaintiffs' unilateral mistake regarding water quality related to a basic assumption of the contracting parties. These claims, therefore, revolve around the defendant's alleged breach of contract, not an action in tort. Thus, this Court has jurisdiction over the plaintiffs' claims.

Moreover, even if this Court were to find that the plaintiffs are alleging tortious conduct on the part of the defendant, this Court would not be foreclosed from hearing this action. While this Court does not have jurisdiction over tort claims, it does have jurisdiction over claims for tortious breach of contract. *Morris,* 33 Fed.Cl. at 742. Under this theory of jurisdiction, the alleged tortious conduct must be related to the alleged contractual obligations of the defendant. *Id.* In this action, the plaintiffs allege that they had a valid contract for the sale of property with HUD. Thus, even if their claims sounded in tort, such claims related to their contract with the defendant and, therefore, this Court's jurisdiction would be appropriate under the Tucker Act. ·

showing that the officials who made the alleged agreement * * * had the authority to commit the Government." *Lehner v. United States,* 1 Cl.Ct. 408, 415 (1983).

In this action, the plain language of the contract unambiguously states that HUD "makes no representations or warranties concering [sic] the condition of the property * * *." Contract at 2. The clear language of the contract puts the plaintiffs on notice that "[t]his contract contains the final and entire agreement" and that the plaintiffs should not rely on any "representations, oral or written, not contained in this contract." *Id.* Nowhere in the contract or its addenda does HUD give Mr. Foster the authority to alter the express terms of the contract or to make representations "concering [sic] the condition of the property." *See id.; Pia v. United States,* 7 Cl.Ct. 208, 211–12 (1985), *aff'd,* 818 F.2d 876 (Fed.Cir.1987). Therefore, any representations by Mr. Foster to the plaintiffs regarding the quality of the water were made without authority and in clear violation of the terms of the sales contract. *See Coastal Indus., Inc. v. United States,* 32 Fed.Cl. 368, 373 (1994). The plaintiffs' claim for contractual misrepresentation fails for the fundamental reason that they have not demonstrated that any of the misrepresentations complained of were made by, or with the authority of, HUD, as a matter of law.

 Next, based on the facts alleged in the Complaint, the plaintiffs could not prove that they were justified in *relying* on the Government's alleged representations concerning the quality of the water, i.e., "a little hard," but otherwise safe. This Court, like most courts, applies the doctrine of *caveat emptor* to real estate transactions. *Mortenson v. United States,* 229 Ct.Cl. 534, 537 (1981). Under this doctrine, the seller of the property does not impliedly warrant the condition of the premises. *Id.*

In this case, the plain meaning of the contract and addenda preclude a finding of justifiable reliance. This is so because the contract stated that HUD "makes no representations or warranties concering [sic] the condition of the property, including but not limited to mechanical systems, dry basement, foundation, structural, or compliance with·code, zoning or building requirements * * *." Contract at 2.

In their opposition to summary judgment, the plaintiffs contend that this language disclaiming warranties or representations concerning the condition of the property is specifically limited to the physical and mechanical aspects of the property listed after the phrase "including but not limited to." According to the plaintiffs, the disclaimer does not include environmental conditions or chemical testing aspects of the property because the contract language does not specifically mention these items. It is this Court's determination, however, that the plaintiffs' argument lacks merit.

It is a fundamental tenet of contract interpretation that the Court must interpret a contract "as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions." *Granite Constr. Co. v. United States,* 962 F.2d 998, 1003 (Fed.Cir.1992), *cert. denied,* 506 U.S. 1048, 113 S.Ct. 965, 122 L.Ed.2d 121 (1993); *see also Stone Forest Indus., Inc.,* 32 Fed.Cl. at 427; *Blake Constr. Co., Inc. v. United States,* 28 Fed.Cl. 672, 687 (1993), *aff'd,* 29 F.3d 645 (Fed.Cir.1994). This Court, as well as other federal courts, have interpreted the phrase "including but not limited to" as general scope language, with the listed examples usually being those that have become universally accepted but not interpreted in the strictest sense as limited to those listed examples. *See Liles Constr. Co. v. United States,* 197 Ct.Cl. 164, 173, 455 F.2d 527, 531 (1972); *see also St. Paul Mercury Ins. Co. v. Lexington Ins. Co.,* 78 F.3d 202, 206–07 (5th Cir.1996) (finding that the term "including" in a contract does not mean an exclusion of any nonlisted items but is read expansively to allow additional terms that fall within the general description found before the term "including"); *Cooper Distrib. Co. v. Amana Refrigeration, Inc.,* 63 F.3d 262, 280 (3d Cir.1995) (finding that by the parties inserting "including, but not limited to" language in their contract, the parties, in effect, "unambiguously stated that the list was not exhaustive").

■ In interpreting the present contract, this Court finds that the "including but not limited to" language that disclaimed conditions of the property should not be read as strictly as the plaintiffs contend. *See Liles,* 197 Ct.Cl. at 173, 455 F.2d at 531. That language does not limit itself to the physical or mechanical aspects listed following "including but not limited to." To the contrary, the phrase should be read expansively to include terms that fall within any representation or warranty related to the "condition of the property." *See St. Paul Mercury Ins. Co.,* 78 F.3d at 206–07. Because the quality of the property's well water easily falls within a "condition of the property," the contract disclaims any "representations or warranties concering [sic]" the quality of the well water.

In addition, the contract stated that the parties would "not be bound by any * * * representations, oral or written, not contained in this contract." These statements warned the plaintiffs that HUD did not warrant the accuracy of any representations made outside of the contract. Thus, the plaintiffs were not entitled to rely on the representations of Mr. Foster because HUD expressly disclaimed any such representations and the representations were not contained in the contract. *See Mortenson,* 229 Ct.Cl. at 537 (finding that HUD's Invitation for Bids for an apartment complex "specifically disclaimed in clear language and in large print that it did not warrant the condition of the property"); *Montreal Sec., Inc. v. United States,* 165 Ct.Cl. 120, 123–24, 329 F.2d 956, 958–59 (interpreting similar contract language), *cert. denied,* 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964).

Moreover, the contract incorporated an as-is agreement, which cautioned the plaintiffs to "assure yourself that its condition is acceptable for your needs as it exists today" and in bold, capitalized type **"DO NOT ASSUME THAT THE PROPERTY IS IN ACCEPTABLE CONDITION!"** Therefore, it was unreasonable and unjustifiable for the plaintiffs to rely on the representations of Mr. Foster about the quality of the property's well water. hi the face of these sweeping disclaimers of representations or warranties regarding the condition of the property, the plaintiffs were unjustified in relying on any representations about the quality of the well water. *See Morris,* 33 Fed.Cl. at 746; *see also Pia,* 7 Cl.Ct. at 211 ("When the Government sells property with such express disclaimers, the risk is on the purchaser."); *Roseberry v. United States,* 736 F.Supp. 408, 409 (D.N.H.1990) ("[T]he VA[, which sold to plaintiffs real estate that contained lead-based paint that harmed the plaintiffs' children], was under no duty to ensure the house was habitable and made no express or implied warranties as such. Rather, plaintiffs purchased their house 'as is'."). In view of the above discussion, the defendant is entitled to summary judgment as to the plaintiffs' claim of contractual misrepresentation.

### B. Unilateral Mistake

■ As a second claim for relief, the plaintiffs set forth a claim for unilateral mistake. According to the plaintiffs' Complaint, the defendant "mistakenly represented" the level of hazardous contaminants contained in the plaintiffs' well water, and as a result of such a mistake, the plaintiffs have sustained compensable losses. Compl. at 4. In its Motion for Summary Judgment, the defendant states that "[u]sually when a party invokes a unilateral mistake claim, the party seeking relief alleges that it acted because it was mistaken with respect to a material fact," not that the adverse party made a mistake. Def.'s Mot. for Summ. Judg. at 10. Thus, the defendant treats the plaintiffs' unilateral mistake claim as one where the plaintiffs acted pursuant to a mistaken belief, and this Court agrees with that characterization of the plaintiffs' claim. The defendant contends that it is entitled to summary judgment on the plaintiffs' unilateral mistake claim because the mistake did not concern a basic assumption of the contract and the contract language demonstrates that the plaintiffs bore the risk of such a mistake. In their opposition to summary judgment on the unilateral mistake claim, the plaintiffs confirm that their claim relates to a mistake by the plaintiffs, not a mistake by the defendant, as they contend in their Complaint. In opposing summary judgment, the plaintiffs contend that there are genuine issues of materi-

al fact as to whether or not the plaintiffs bore the risk of a mistake.

■ To obtain a remedy for a unilateral mistake, a plaintiff must prove that:

(i) a mistake was made by the party at the time the contract was made;

(ii) the mistake concerned a basic assumption of the contract;

(iii) the mistake has a material effect on the agreed exchange of performances;

(iv) the party does not bear the risk of the mistake; and

(a) the effect of the mistake would make enforcement of the contract unconscionable, *or*

(b) the other party had reason to know of the mistake or his fault caused the mistake.

*Morris,* 33 Fed.Cl. at 747 (quoting *Meek v. United States,* 26 Cl.Ct. 1357, 1362 (1992), *aff'd,* 6 F.3d 788 (Fed.Cir.1993), and RESTATEMENT (SECOND) OF CONTRACTS § 153 (1981)). In this action, the plaintiffs' claim for unilateral mistake fails to state a claim because it does not concern a basic assumption on which the parties made the contract and the plaintiffs could not prove that they did not bear the risk of mistake.

■ In taking the facts as alleged, the quality of the well water was not a basic assumption of the parties in making the contract. As discussed above, the contract unambiguously disclaimed any "representations or warranties concering [sic] the condition of the property." Indeed, the contract incorporated an as-is agreement, which specifically stated **"DO NOT ASSUME THAT THE PROPERTY IS IN ACCEPTABLE CONDITION!"** and that the plaintiffs must "assure [themselves] that its condition is acceptable for [their] needs as it exists today." Thus, it was clearly foreseeable that the "condition of the property" may or may not

have met the needs of the plaintiffs at the time that the contract was signed, and they were required to ascertain for themselves whether or not that condition was acceptable for their needs. Accordingly, the quality of the property's well water, a "condition of the property," could not have been a basic assumption of the parties to the contract before the Court. *See Morris,* 33 Fed.Cl. at 747–48.[6]

Also, based on the facts in their Complaint, the plaintiffs cannot prove facts that they did not bear the risk of mistake. While disclaimers of warranty or representations may appear to place a harsh risk of loss upon buyers of surplus property (real or personal) from the Federal Government, this Court has uniformly upheld the shifting of the risk of loss via contract. As this Court previously stated:

Buyers of such surplus property know perfectly well that there is always the chance of buying property that may turn out to be of little value, or may develop into a great bargain with a huge windfall of profit. Accordingly, the government very properly has protected itself by formulating its contract for the sale of such surplus property so as to shift the risk from itself to the buyer. As Professor Corbin tells us, a party to a contract may agree to assume certain risks that in the absence of agreement the law would not cast upon him.

*Commodities Recovery Corp. v. United States,* 34 Fed.Cl. 282, 292 (1995) (quoting *Dadourian Export Corp. v. United States,* 291 F.2d 178, 182 (2d Cir.1961)).

The contract between the plaintiffs and HUD plainly stated that HUD "makes no representations or warranties concering [sic] the condition of the property" and that the **"property is sold 'AS–IS.'"** These provisions expressly allocate the risk of any mistaken beliefs about the condition of the property to

---

6. In its opposition to Defendant's Motion for Summary Judgment, the plaintiffs contend that a basic assumption of the parties to the contract was the quality of the property's well water. Such a mistaken assumption involves a mistake of contract interpretation of the phrase "concering [sic] the condition of the property." This mistake constitutes not a mistake of fact but a mistake of law, which does not afford the plain-

tiffs any ground for relief under a unilateral mistake theory. *See National Rural Util. Co–op. Fin. Corp. v. United States,* 14 Cl.Ct. 130, 141 (1988), *aff'd,* 867 F.2d 1393 (Fed.Cir.1989); *see also C & L Constr. Co. v. United States,* 6 Cl.Ct. 791, 797–98 (1984) (finding that reformation of a contract for a mistake of law, as opposed to a mistake of fact, is rare), *aff'd,* 790 F.2d 93 (Fed. Cir.1986).

the plaintiffs. Thus, the plaintiffs bore the risk that their beliefs about the quality of the well water were not in accordance with the facts. *See Meek,* 26 Cl.Ct. at 1360, 1362. This finding is compelled by this Court's earlier determination that the plaintiffs were not justified in relying on the alleged misrepresentations of Mr. Foster. *See Morris,* 33 Fed.Cl. at 748. "[A] holding that a party was not entitled to rely on the statement causing his mistaken belief necessarily means that that party bore the risk of his mistake." *Id.*

Moreover, the incorporated as-is agreement stated in bold, capitalized type that **"DO NOT ASSUME THAT THE PROPERTY IS IN ACCEPTABLE CONDITION!"** This should have been sufficient to alert a reasonable purchaser to investigate the condition of the property further. *See Butler v. United States,* 213 Ct.Cl. 379, 385, 551 F.2d 286, 290 (1977).[7] It is, therefore, beyond genuine dispute that the plaintiffs were on notice that the property they were purchasing may or may not have contained conditions that were unsuitable to their current needs. Thus, the plaintiffs' Complaint fails to state a claim for unilateral mistake, and the defendant is, therefore, entitled to summary judgment on that claim.

## C. Unjust Enrichment

In their Complaint's third claim for relief, the plaintiffs aver that the defendant's misrepresentations concerning the property induced the plaintiffs to purchase the property, whereby the plaintiffs paid HUD the agreed-to purchase price. As a result, the plaintiffs contend that the defendant received a benefit from the misrepresentations, and it would be inequitable for the defendant to retain the monies paid pursuant to the misrepresentations. It its Motion for Summary Judgment, the defendant contends that the plaintiffs' unjust enrichment claim fails because it is based on an implied contract, which cannot exist in the face of an express contract on the same subject, *i.e.,* the sale of the property to the plaintiffs.

To establish a claim for unjust enrichment, a plaintiff must demonstrate that a benefit was conferred upon, and appreciated by, the adverse party and that it would be inequitable for the adverse party to retain the benefit without payment of its value to the plaintiff. *See Janowsky v. United States,* 36 Fed.Cl. 148, 152 (1996); *Spalding & Son, Inc. v. United States,* 24 Cl.Ct. 112, 149–50 (1991), *rejected on other grounds,* 28 Fed.Cl. 242 (1993). A claim for unjust enrichment essentially states a claim for breach of an implied-in-law contract. *Trauma Serv. Group, Ltd. v. United States,* 33 Fed.Cl. 426, 432 (1995), *aff'd,* 104 F.3d 1321 (Fed.Cir. 1997). However, the Tucker Act does not give this Court jurisdiction over actions for breach of an implied-in-law contract. *Id.; Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). Moreover, there can be no implied-in-law contract and, thus, no claim for unjust enrichment, when an express contract covering the same subject exists. *Trauma,* 33 Fed.Cl. at 432.

The plaintiffs' claim for unjust enrichment is essentially a claim for breach of an implied-in-law contract, over which this Court has no jurisdiction. In addition, the sales contract and addenda is an express contract covering the same subject matter as the plaintiffs' claim for unjust enrichment. Therefore, this Court has no authority to hear the plaintiffs' claim for unjust enrichment. Because this Court does not have jurisdiction over the plaintiffs' unjust enrich-

---

7. The plaintiffs were also on notice as to the character of the neighborhood in which the property was located, as well as the vicinity of the surrounding area. Approximately seven miles southwest of Brighton, where the plaintiffs' property was located, was the RMA, a "17,000-acre former U.S. Army chemical warfare and incendiary munitions manufacturing and assembly plant * * *." EPA Abstract, Jan. 15, 1993. The land was later used to hold facilities that manufactured various insecticides and herbicides, as well as destroyed chemical warfare materials. This information is based on the plaintiffs' own exhibits submitted to this Court in opposing the Defendant's Motion for Summary Judgment. According to that literature, which consists of various intergovernmental reports and studies, the dispersion of contaminants from the various activities at the RMA have been articulated risks accompanying the increased residential development in the areas surrounding the RMA since the late 1950's. The plaintiffs are or should have been aware of this public information.

ment claim, the Defendant's Motion for Summary Judgment regarding that claim is also granted.[8]

The plaintiffs' Complaint also appears to articulate a request for a declaratory judgment to the effect that the plaintiffs be indemnified for the proximate and foreseeable consequences of the defendant's alleged wrongful actions, including but not limited to: (1) costs and damages due to the contamination; (2) liability for damages to third parties because of the contamination; (3) costs, including fees, in determining the defendant's liability; (4) any liability under federal and state environmental statutes; (5) costs and fees for proving such statutory liability; and (6) other costs and fees associated with the defendant's alleged wrongful acts. According to the plaintiffs' Complaint, they only seek a declaratory judgment "if Defendants are found liable for any of the claims for relief * * *." Compl. at 5.

In its Motion for Summary Judgment, the defendant contends that the plaintiffs' "claim" for declaratory judgment is contingent upon their claims for contractual misrepresentation, unilateral mistake, and unjust enrichment. Therefore, the defendant argues that, because it is entitled to summary judgment on the plaintiffs' other claims, it is entitled to summary judgment on the declaratory judgment claim. This Court agrees with the defendant. In fact, by the plaintiffs' own acknowledgement, their declaratory judgment claim is contingent upon prevailing on their claims for contractual misrepresentation, unilateral mistake, and unjust enrichment. Therefore, because this Court grants the Defendant's Motion for Summary Judgment on the plaintiffs' claims for contractual misrepresentation, unilateral mistake, and

unjust enrichment, it also grants the defendant's motion on the declaratory judgment claim.

▉ Finally, in a footnote to its Motion for Summary Judgment, the defendant questions the propriety of including the plaintiffs' children, Hamid Nematollahi and Iman Nematollahi, as plaintiffs because they were not parties to the contract with HUD. This Court now reviews the issue *sua sponte* and dismisses Hamid and Iman Nematollahi as parties to this action.

▉ To entitle one who is not a party to a contract with the Federal Government to sue the Government for breach of contract pursuant to this Court's Tucker Act jurisdiction, the third party must establish that he is an intended third-party beneficiary of the contract. *National Sur. Corp. v. United States,* 31 Fed.Cl. 565, 575 (1994); *Schuerman v. United States,* 30 Fed.Cl. 420, 433 (1994). The proper test to establish one as an intended third party beneficiary is whether the parties to the contract specifically intended to directly benefit the third party. *Id.*[9]

In this action, Hamid and Iman Nematollahi are not parties to the contract between their parents, Kamran and Tracy Nematollahi, and HUD. Moreover, the plaintiffs do not allege that they (Kamran and Tracy Nematollahi) and HUD intended that the contract directly benefit the plaintiffs' children. In fact, this Court cannot find any support for such a finding of an intent to benefit directly Hamid and Iman Nematollahi by the parties' performance of the contract for the purchase of the Brighton, Colorado, property. The plaintiffs, Hamid and Iman Nematollahi, therefore, lack standing to assert contract claims against the defendant. Thus,

---

8. Even if this Court were to have jurisdiction over this unjust enrichment claim, the same logic as articulated in the plaintiffs' claims discussed in sections A and B above would preclude any recovery here. There can be no unjust enrichment when plaintiffs received the property they contracted for under the disclaimer provisions that they had agreed to as contained in the contract.

9. Earlier United States Claims Court decisions state that the test to determine whether or not a third party can sue as an intended third-party beneficiary is two pronged: (1) that the contract-

ing parties intended to directly benefit the third party, and (2) that the contract reflects the intent to directly benefit the third party. *See Baudier Marine Elecs. Sales & Serv., Inc. v. United States,* 6 Cl.Ct. 246, 249 (1984), *aff'd,* 765 F.2d 163 (Fed.Cir.1985), *quoted in Clean Giant, Inc. v. United States,* 19 Cl.Ct. 390, 394 (1990). While *National Sur. Corp.* and *Schuerman* reject the second prong of the test and disagree that the intent to directly benefit the third party must be reflected in the contract, the result in this case is the same.

this Court dismisses Hamid and Iman Nematollahi as plaintiffs in this action without prejudice.[10]

## CONCLUSION

For the foregoing reasons, the plaintiffs, Hamid and Iman Nematollahi, are dismissed as parties to this action, the defendant's Motion for Summary Judgment is granted, and the plaintiffs' Complaint will be dismissed.

The clerk of the Court is directed to enter judgment accordingly.

Each party is to bear its own costs.

---

**10.** Even if this Court were to deny the defendant's Motion for Summary Judgment, it does not have jurisdiction over the claims of the plaintiffs, Hamid and Iman Nematollahi.