United States Court of Appeals,

Fifth Circuit.

No. 95-20544.

ST. PAUL MERCURY INSURANCE COMPANY;  Centennial Insurance Company, Plaintiffs-Appellant Cross-Appellees,

v.

LEXINGTON INSURANCE COMPANY;  Landmark Insurance Company, Defendants-Appellee Cross-Appellants.

March 27, 1996.

Appeal from the United States District Court for the Southern District of Texas.

Before KING, WIENER and BENAVIDES, Circuit Judges.

WIENER, Circuit Judge:

The primary issue presented by this appeal is the effect of conflicting "other insurance" clauses on the obligations of primary and excess insurance carriers to contribute to a settlement entered into by the insured.  Applying Texas law, the district court prorated liability first among the primary carriers, and then among the excess carriers, in proportion to the amount of insurance provided by the insurers' respective policies.  In the final analysis, proration as to the primary carriers was immaterial because they had to pay their full policy limits;  however, the excess carriers were required to contribute pro rata to satisfy the remaining settlement amount.  Agreeing with the district court's interpretation and application of Texas law, we affirm.

I.

FACTS AND PROCEEDINGS

In March of 1992, Blake Foret was severely injured in the

1

course and scope of his employment for the Campbell Wells Corporation, a wholly owned subsidiary of Sanifill, Inc. (collectively, Sanifill). While unloading nonhazardous oil field waste from a barge that was docked at Bateman Island, near Morgan City, Louisiana, Foret was pinned between the counter-weight of an excavator and the side of the barge. As a result, Foret suffered a fractured dislocation of the pelvis, a ruptured bladder and urethra, and a perineal and rectal tear.

In July of 1992, in an effort to recover damages arising from the accident, Foret and his wife filed suit in Texas state court against Sanifill. It was covered by insurance policies from four insurers: Centennial Insurance Company (Centennial)[1], which issued a primary hull and protection and indemnity policy with a limit of $500,000; Centennial's excess carrier, St. Paul Mercury Insurance Company (St. Paul), which provided an excess protection and indemnity policy with a $4,500,000 limit per occurrence; Landmark Insurance Company (Landmark), which issued a primary workers' compensation and employers' liability policy with a $1,000,000 limit per occurrence; and Landmark's excess carrier, Lexington Insurance Company (Lexington), which provided an excess policy with a $5,000,000 limit per occurrence. Centennial assumed the defense of Sanifill in the Foret suit; and St. Paul provided associate counsel. Both Landmark and Lexington were given notice of the

---

[1]As Centennial Insurance Company is a member of the Atlantic Mutual Companies, some of the parties use the designation "Atlantic Mutual" for this insurer. Nevertheless, throughout this opinion we refer to this party as Centennial.

suit; and both participated in the settlement negotiations between Sanifill and the Forets.

In December of 1993, the Foret suit settled for $4.8 million. Sanifill's four insurers contributed to the Foret settlement as follows: Centennial paid its policy limit, $426,352.55 in settlement fees and $73,647.45 in attorneys fees; St. Paul contributed $1,773,647.50; Landmark paid its policy limits of $1,000,000; and Lexington contributed $1,600,000. Each of the insurers reserved the right to seek a judicial determination of its contribution obligation to the settlement.

On December 27, 1993, Lexington filed a diversity action against St. Paul in federal district court, seeking a declaratory judgment of the parties' respective contribution obligations to the Foret settlement. In April of 1994, Lexington added Centennial as a party and brought an additional claim in which it alleged negligent handling of the Foret suit by Centennial and St. Paul. Shortly thereafter, Landmark was joined in the action. St. Paul and Centennial, seeking reimbursement for their contributions to the Foret settlement, asserted counterclaims against Lexington and Landmark. The parties were eventually realigned, with St. Paul and Centennial proceeding as plaintiffs, and Landmark and Lexington proceeding as defendants.

After each of the four parties moved for summary judgment, the magistrate judge issued a memorandum recommending that summary judgment of dismissal be granted in favor of St. Paul and Centennial on the negligence claim brought by Landmark and

3

Lexington. With respect to the issue of the parties' respective obligations to contribute to the Foret settlement, the magistrate judge recommended a grant of summary judgment declaring that (1) Sanifill's primary carriers, Landmark and Centennial, were obligated to contribute the entirety of their policy limits to the settlement of the Foret suit, with the attorneys fees and costs incurred by Centennial in the defense of the suit deducted from the amount owed by Centennial; and (2) Sanifill's excess carriers, St. Paul and Lexington, were obligated to contribute the difference (i.e. the amount still owing to the Forets after full payment by Landmark and Centennial) prorated on the basis of the amount of coverage provided in the excess insurers' respective policies.

In June of 1995, the district court issued a final judgment which incorporated the magistrate judge's memorandum as the opinion of the court. The district court also issued an order adopting the magistrate judge's recommendations with one minor modification involving the obligations of Centennial and Landmark regarding the costs incurred in the defense of the Foret suit. Each of the parties timely appealed to this court.

## II.

## ANALYSIS

A. STANDARD OF REVIEW

When reviewing a grant of summary judgment, we view the facts and inferences in the light most favorable to the non-moving

4

party[2]; and we apply the same standards as those governing the trial court in its determination.[3] Summary judgment must be granted if a court determines "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4]

B. CHOICE OF LAW

The first argument presented by St. Paul and Centennial is that the district court erred in applying Texas law rather than Louisiana law. A federal court must follow the choice-of-law rules of the state in which it sits.[5] Under Texas choice-of-law rules, disputes are governed by the law of the state with "the most significant relationship to the particular substantive issue."[6]

As both Louisiana and Texas have some connection to this appeal, we must examine the nature of both states' contacts. On the one hand, Louisiana is connected almost exclusively to the underlying Foret suit: Campbell-Wells is a Louisiana corporation; the Forets are Louisiana citizens; and Foret was injured in

---

[2]See Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 266 (5th Cir.1995).

[3]See Neff v. Am. Dairy Queen Corp., 58 F.3d 1063, 1065 (5th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996).

[4]FED.R.CIV.P. 56(c).

[5]See Atlantic Mut. Ins. Co. v. Truck Ins. Exch., 797 F.2d 1288, 1291 (5th Cir.1986) (citing Stuart v. Spademan, 772 F.2d 1185, 1193 (5th Cir.1985)).

[6]See id. (internal quotations omitted); see also W.R. Grace & Co. v. Continental Casualty Co., 896 F.2d 865, 873 (5th Cir.1990).

Louisiana. By contrast, Texas has more significant ties to the insurance dispute that is the direct subject of this appeal: Three of the four insurance policies involved in the case—the Lexington policy, the Centennial policy, and the St. Paul policy—were issued and delivered to Sanifill in Texas. Sanifill operates a place of business in Texas; and the dispute regarding the priority of coverage arose in Texas state court during the defense of the Foret suit there. We have held that when the issues of a case require the construction and application of insurance policies, as they do in the instant case, the relevant inquiry is what contacts the state has with the insurance dispute, and not with an underlying lawsuit.[7] Accordingly, we reject the argument that the district court should have applied Louisiana law to the issues presented by this appeal.[8]

C. PRIORITY OF COVERAGE

With the choice of law question behind us, we turn to the issue of the parties' respective obligations to the Foret settlement. Each of the four insurers asserts arguments to establish that it is entitled to full reimbursement of the sums that it has contributed to the settlement.

---

[7]*See W.R. Grace,* 896 F.2d at 873; *Atlantic Mut. Ins. Co.,* 797 F.2d at 1291-92.

[8]As an alternate ground for its decision to apply Texas law, the district court held that "[e]ven if Texas did not have the most significant relationship to the parties and issues in this case, the Texas Insurance code compels the application of Texas law in instances such as this." As we affirm the district court's conclusion that Texas has the most significant connection to the case, we need not address the court's interpretation of the Texas Insurance Code.

1. *The "Other Insurance" Clauses*

In evaluating the validity of the parties' attempts to avoid contribution to the settlement, we must first examine the terms of each of the policies. Of particular importance are the policies' "other insurance" clauses. "Other insurance" clauses are generally designed by insurers to "avoid an insured's temptation or fraud of over-insuring ... property or inflicting self-injury."[9] Such clauses typically fall into three categories: (1) pro rata clauses, which restrict the liability of concurring insurers to an apportionment basis; (2) excess clauses, which restrict the liability of an insurer to excess coverage after another insurer has paid up to its policy limits; and (3) escape clauses, which avoid all liability in the event of other insurance.[10] When only one of the concurrent policies covering a matter contains an "other insurance" clause, it is given effect without complication. However, "[p]roblems arise when more than one policy covers the same insured and each policy has an "other insurance' clause which restricts its liability by reason of the existence of other coverage."[11]

Three independent "other insurance" clauses are found in the policies that were issued to Sanifill. First, Centennial's policy contains an escape clause which provides that "where the Assured

---

[9]*Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.,* 444 S.W.2d 583, 586 (Tex.1969).

[10]*Id.*

[11]*Id.*

is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance or otherwise." Additionally, St. Paul's policy incorporates Centennial's escape clause. Even though St. Paul's policy does not independently contain an "other insurance" clause, the policy includes a "following form" provision, which states that the policy is to "[f]ollo[w] [the] terms and conditions of [Centennial's] insurance, including named assureds, special additional assureds, loss payees, and waivers of subrogation." Accordingly, the district court correctly concluded that "all the provisions in the Centennial policy which are not in direct conflict with a provision in the St. Paul policy, including the escape type "other insurance' clause, are to be considered part and parcel of the St. Paul policy." The district court based this conclusion on the language of the agreement and the summary judgment evidence regarding the intent of the parties with respect to this issue.

Lexington argues that the doctrine of *expressio unius est exclusio alterius* compels the conclusion that St. Paul's policy does not incorporate Centennial's escape clause. Under that doctrine, the enumeration of one or more of the elements of a class " "implies [the] exclusion of all not expressed, even though all would have been implied had none been expressed.' "[12] Accordingly,

---

[12]*See Allied Chem. Corp. v. Am. Indep. Oil Co.,* 623 S.W.2d 760, 763 (Tex.App.1981, writ ref'd n.r.e.).

8

Lexington argues that by including a list of Centennial's terms and provisions to be incorporated by reference into St. Paul's policy, St. Paul is presumed to have excluded any unlisted terms and provisions, such as the escape clause.

We decline Lexington's invitation to overrule the district court's conclusion on this issue. First of all, we are not convinced that the rule of *expressio unius est exclusio aterius* applies in the instant case, as the challenged list of provisions in St. Paul's contract is prefaced by the word "including," which is generally given an *expansive* reading, even without the additional if not redundant language of "without limitation."[13] Moreover, assuming *arguendo* that Lexington has properly invoked the rule of *expressio unius est exclusio alterius,* the Texas courts have held that "a rule of construction in law does not overrule or supersede the intention of the parties to the contract."[14] The application of the rule in this case is accordingly inappropriate in any event, as it would produce a result that contravenes the intention of the parties with respect to St. Paul's policy. We therefore affirm the district court's holding that St. Paul's

---

[13]*Cf. Maley v. 7111 Southwest Freeway, Inc.,* 843 S.W.2d 229, 231 (Tex.App.1992, writ denied) (referring to "including" and "etc." as words which "open the door" for courts to expand a list).

[14]*See id.* (refusing to apply the rule of *expressio unius est exclusio alterius* in the face of contrary evidence with respect to the parties' intentions); *see also Jochec v. Clayburne,* 863 S.W.2d 516, (Tex.App.1993, writ denied) (recognizing that general rules of construction "[are] necessarily arbitrary and should be used only as a "tie-breaker' where more direct evidence does not resolve the ambiguity").

policy incorporates Centennial's escape clause.

The second "other insurance" clause that is of significance to this appeal is a pro rata clause found in the policy issued by Landmark. The pro rata clause states that Landmark "will not pay more than [its] share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid." Lexington's policy also contains an excess clause which stipulates that "[i]f other valid and collectible insurance with any other insurer is available to the Insured covering a loss also covered hereunder, this insurance shall be excess of, and shall not contribute with such other insurance."

2. *Alleged Waiver of Right to Rely on "Other Insurance" Clauses*

a. *Direct Application of Reservation of Rights Rule*

Landmark and Lexington contend that St. Paul and Centennial have waived the right to rely on the escape clauses in their policies because they assumed Sanifill's defense in the Foret suit without obtaining a reservation of rights, even though they had at least constructive knowledge that Landmark and Lexington had issued policies to Sanifill which might trigger the escape clauses.[15] For

---

[15]It is unclear whether Landmark and Lexington take the position that St. Paul and Centennial should have issued a reservation of rights letter regarding the "other insurance" clause issue to Sanifill, or to Landmark and Lexington, or to all three parties. As support for their argument, Landmark and Lexington point out that (1) Centennial never sent a reservation of rights letter to Sanifill; (2) Centennial waited until shortly before settlement negotiations began in the Foret suit to demand the participation of Landmark and Lexington; and (3) St. Paul sent an "eleventh hour" reservation of rights letter to Sanifill that did not discuss the "other insurance" clauses. Our analysis remains

10

this argument, Landmark and Lexington rely on cases which hold that an insurer must reserve its rights vis à vis *its insured:* "[I]f an insurer assumes the insured's defense without declaring a reservation of rights, or obtaining a non-waiver agreement, and with knowledge of facts indicating noncoverage, all policy defenses, including those of noncoverage, are waived, or the insurer may be estopped from raising them."[16]

Landmark and Lexington cite no authority for the proposition that an insurer must reserve its rights vis à vis another *insurer* when it assumes the defense of an insured. The distinction between the company's own insured and another insurer is significant, as the waiver principle invoked by Landmark and Lexington constitutes a narrow exception to a general rule that "the doctrines of waiver and estoppel cannot be used to create insurance coverage where none exists under the terms of the policy,"[17] Moreover, this exception is specifically intended to protect an *insured* for reasons that simply do not apply to other insurers:

> At least one of the reasons for the rule appears to be the existence of a conflict of interests, either actual or potential, between the insured and the insurer in connection

---

the same, whether we characterize the argument as a challenge to the failure deliver a reservation of rights to the insured or as a challenge to the failure to deliver a reservation of rights to other insurers.

[16]*See, e.g. Pitts, by and through Pitts v. Am. Surety Life Ins. Co.,* 931 F.2d 351 (5th Cir.1991); *Ideal Mut. Ins. Co. v. Myers,* 789 F.2d 1196 (5th Cir.1986); *Pacific Indem. Co. v. Acel Delivery Serv., Inc.,* 485 F.2d 1169 (5th Cir.1973), *cert. denied,* 415 U.S. 921, 94 S.Ct. 1422, 39 L.Ed.2d 476 (1974); *State Farm Lloyds, Inc. v. Williams,* 791 S.W.2d 542, (Tex.App.1990, writ denied).

[17]*See State Farm Lloyds,* 791 S.W.2d 542.

with the conduct of the defense of the insured. For example, a conflict of interests might arise when the insurer represents the insured in a lawsuit and simultaneously formulates its defense of noncoverage against the insured. A number of cases indicate or suggest that the rule is also justified by the fact that the insured is deprived of the right to completely control his defense; some of these cases further suggest that this situation is inherently prejudicial to the insured in the absence of a reservation of rights.[18]

In sum, the waiver rule invoked by Landmark and Lexington is simply not intended to be applied to the relationship among insurers. Accordingly, like the district court, we reject the argument that St. Paul and Centennial waived the right to rely on their "other insurance" clauses by failing to reserve the right to avoid coverage on the basis of those clauses.

b. *Waiver Through Equitable Subrogation and the Negligence Claim*

Landmark and Lexington also attempt to raise their waiver argument through the theory of equitable subrogation. Under this theory, "[an] insurer paying a loss under a policy becomes equitably subrogated to any cause of action the insured may have against a third party responsible for the loss. The excess insurer would thus be able to maintain any action that the insured may have against the primary carrier for mishandling the claim."[19] As the excess carrier "stands in the shoes" of the insured vis à vis the primary carrier, the excess carrier is subject to any policy defense assertible by the primary carrier against the insured[20];

---

[18]*See id.* at 551.

[19]*Am. Centennial Ins. Co. v. Canal Ins. Co.,* 843 S.W.2d 480, 482 (Tex.1992).

[20]*See Am. Centennial,* 843 S.W.2d at 483.

12

and in turn, according to Landmark and Lexington, "[i]t is axiomatic that if the excess carrier is burdened by policy defenses assertible against the insured, the excess carrier must also be allowed to reap the benefit of any waiver arguments that the insured would have against the primary carrier." More specifically, Landmark and Lexington argue that (1) Sanifill has a cause of action against Centennial and St. Paul for negligence in the handling of its defense; (2) as excess insurers, Landmark and Lexington can assert this cause of action for Sanifill against Centennial and St. Paul; and (3) in the context of this negligence action, Landmark and Lexington can assert any waiver argument that Sanifill would have been able to raise against Centennial and St. Paul.

This equitable subrogation argument fails from the start if Landmark and Lexington are unable to establish that Sanifill would have a cause of action against Centennial and St. Paul for negligence.[21] In determining whether Sanifill would have a

---

[21]*See Employers Nat'l Ins. Co. v. Gen. Accident Ins. Co.,* 857 F.Supp. 549, 552 (S.D.Tex.1994) (holding that before an excess carrier can recover under a theory of equitable subrogation, "the excess carrier has to prove that the primary carrier was negligent in fulfilling its duties to the insured under the primary policy's terms").

It is also significant that Centennial and St. Paul reached a settlement whose value fell within the combined limits of their policies, as the purpose behind the doctrine of equitable subrogation is to create an incentive for insurers defending a case to work to settle a case within the limits of their policies, even when it is reasonably clear that their policies will be consumed:

[I]f an insurer with a policy limit of $1,000,000 believes that there is only a five percent chance that it

negligence claim, we examine whether Landmark and Lexington have presented any evidence establishing that (1) the estimate made by Centennial and St. Paul regarding the insurers' potential liability in the Foret suit was unreasonable, or (2) Landmark and Lexington failed to perform in good faith.[22]

Landmark and Lexington have produced no evidence establishing that the settlement reached in the Foret suit was unreasonable, particularly in light of the gruesome nature of the injuries sustained by Foret. According to uncontroverted testimony submitted in the summary judgment proceedings, Foret was "lacerated from his scrotum to his rectum. He was basically just ripped open. His pelvis was completely crushed.... He lost bladder control, became impotent, had to wear a colostomy bag, [and] had to walk with a cane.... It was just a horrible injury." Moreover, even though Landmark and Lexington are dissatisfied with a number of actions taken by Centennial and St. Paul in the defense of Sanifill, they have produced nothing more than conclusionary

> will win at trial, it might refuse a settlement offer of $950,000, because it would at most be risking $50,000 if a jury found for the plaintiff, even if the verdict was $5,000,000. Because it is the insured's or an excess carrier's money that is at risk above the ... policy limits, the [insurer] must have a duty to handle the claim with the insured's best interests in mind as well as its own.

*Employers Nat'l Ins. Co.,* 857 F.Supp. at 552; *see also Am. Centennial,* 843 S.W.2d at 482-83. Thus, the fact that Centennial and St. Paul brokered a settlement within their combined policy limits supports our conclusion that Landmark and Lexington may not rely on the theory of equitable subrogation.

[22]*See Employers Nat'l,* 857 F.Supp. at 552.

14

allegations in support of their contention that the actions of Centennial and St. Paul caused any increase in the value of the settlement. Finally, Landmark and Lexington cannot support a claim that Centennial and St. Paul failed to operate in good faith: It is undisputed that Centennial and St. Paul informed Landmark and Lexington of their defense strategy as the Foret suit unfolded, and it is also undisputed that Landmark and Lexington made no timely objections to the actions taken by Centennial and St. Paul. In sum, Landmark and Lexington have failed to establish that the defense provided by Centennial and St. Paul gave rise to a negligence cause of action; accordingly, the district court properly held that they were not entitled to proceed under a theory of equitable subrogation.

Landmark and Lexington also brought an independent negligence claim seeking recovery in their own right for the alleged mishandling of the Foret defense. Just as they have offered insufficient evidence to establish that Sanifill could bring a negligence cause of action against Centennial and St. Paul, Landmark and Lexington cannot survive summary judgment on their independent negligence claim. They offer no proof that the Foret settlement was unreasonable and no proof that the actions of Centennial and St. Paul increased the value of the settlement. Accordingly, we affirm the grant of summary judgment in favor of Centennial and St. Paul on this issue.

3. *The Primary and Excess Policies*

Having determined that Centennial and St. Paul have not

15

waived their right to rely on the "other insurance" clauses in their policies, we must next address the issue of how the "other insurance" clauses affect the liabilities of the insurers involved in the Foret settlement. We first examine the impact of the "other insurance" clauses in the policies issued by primary carriers Centennial and Landmark, as Texas law dictates that primary policies' limits must be exhausted before excess insurers become liable.[23]

Centennial argues that the escape clause in its policy relieves it of liability and renders Landmark the sole primary carrier that must contribute to the Foret settlement. In response,

_____

[23]This rule results from the difference in the nature of primary policies and excess policies. The rationale behind the rule was explained at length in *Emscor Mfg., Inc. v. Alliance Ins. Group,* 879 S.W.2d 894, 903 (Tex.App.1994, writ denied) (citations omitted) (internal quotations omitted) (emphasis added):

> Primary insurance coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to the liability. An excess policy is one that provides that the insurer is liable for the excess above and beyond that which may be collected on primary insurance. In a situation where there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement. In such a situation, the various insurance companies are not covering the same risk; rather, they are covering *separate and clearly defined layers of risk.* The remote position of an excess carrier greatly reduces its chance of exposure to a loss. This reduced risk is generally reflected in the cost of the excess policy.

*See also Utica Nat'l Ins. Co. v. Fidelity & Casualty Co. of New York,* 812 S.W.2d 656 (Tex.App.1991, writ denied) (citing *Atlantic Mut. Ins. Co. v. Truck Ins. Exchange,* 797 F.2d 1288 (5th Cir.1986)); *Union Indem. Ins. Co. v. Certain Underwriters,* 614 F.Supp. 1015, 1017 (S.D.Tex.1985).

16

Landmark and Lexington argue that Centennial's escape clause must yield to Landmark's pro rata clause. In *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.,*[24] emphasizing that "dominant consideration" should be given to the rights of the insured, the Texas Supreme Court adopted the following rule with regard to conflicting "other insurance" clauses:

> When, from the point of view of the insured, she has coverage from either one of two policies but for the other, and each contains a provision which is reasonably subject to a construction that it conflicts with a provision in the concurrent insurance, there is a conflict in the provisions....
>
> ... It seems to us that the only reasonable result to be reached [in such cases] is a proration between the two insurance companies in proportion to the amount of insurance provided by their respective policies.[25]

In the instant case, Sanifill would be entitled to full coverage under Landmark's policy were it not for the existence of Centennial's policy; and Sanifill would be entitled to full coverage under Centennial's policy were it not for the existence of Landmark's policy. In other words, Landmark's pro rata clause conflicts with Centennial's escape clause, so we must prorate liability. In the context of this case, proration amounts to payment of the full amount specified in each policy, as primary coverage policy limits must be exhausted before excess policies

---

[24] 444 S.W.2d 583 (Tex.1969).

[25] *Id.* at 590 (internal quotations omitted). Centennial argues that *Hardware Dealers* is not applicable to this case, as it involved a conflict between an escape clause and an excess clause, rather than an escape clause and a pro rata clause. We disagree. *Hardware Dealers* set forth a general principle for resolving conflicting "other insurance" clauses, and that principle controls our decision in this case.

17

kick in. Here, the amount of the Foret settlement exceeded the aggregate limits of the two primary policies; and, as both Centennial and Landmark contributed their policy limits to that settlement, the district court was correct in holding that they are not entitled to reimbursement for their contributions.

The *Hardware Dealers* decision also guides our determination of the liability of the excess carriers involved in this appeal. Centennial and St. Paul argue that *Hardware Dealers* does not control this issue because it addressed conflicting "other insurance" clauses in primary policies, not excess policies. We note, however, that nothing in the *Hardware Dealers* opinion suggests that its holding or the reasoning behind it should be limited to disputes involving primary policies. As Centennial and St. Paul have raised no compelling argument in support of limiting the principle espoused in *Hardware Dealers* to primary policies, we conclude that this argument raises at most a "distinction without a difference." In fact, with regard to the instant excess policies, we face the same substantive task presented to the *Hardware Dealers* court—resolving a conflict between an escape clause and an excess clause. Accordingly, we affirm the district court's decision to prorate the remaining settlement amount between St. Paul and Lexington.

D. ATTORNEYS FEES AND COSTS

As a final issue, we consider the parties' various appeals for an award of attorneys fees and costs. First, St. Paul argues that it was entitled to reimbursement of the costs and attorneys

18

fees it incurred in defending the Foret suit. The district court refused to allow recovery of those costs and fees on the grounds that St. Paul elected to hire its own counsel after Centennial had already hired defense counsel. We agree with the district court's assessment of this issue.

Additionally, each of the four insurers requests an award of the costs and attorneys fees incurred with respect to the instant case. As no party raises a persuasive argument in support of its request, we affirm the district court's refusal to award to any of the parties the attorneys fees or costs incurred in the insurance litigation that followed the Foret settlement.

III.

CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment declaring the respective obligations of the insurers to contribute to the Foret settlement, as well as the district court's grant of summary judgment in favor of Centennial and St. Paul on Landmark and Lexington's negligence claim.

AFFIRMED.