**BUILDERS TRANSPORT, INC., Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**BUILDERS TRANSPORT, INC., Plaintiff,**

v.

**ALEXANDER & ALEXANDER OF NEW YORK, INC., Tri-City Insurance Brokers, Inc., American International Group, Inc., The Insurance Company of the State of Pennsylvania, Reliance National Indemnity Company and Law, Snakard & Gambill, Defendants.**

Nos. Civ.A. 1:95-CV-0381, 1:96-CV-0209.

United States District Court, E.D. Texas, Beaumont Division.

Apr. 3, 1998.

J. Thad Heartfield, Heartfield & McGinnis, L.L.P., Beaumont, TX, Christopher A. Marothy, Fischbein Badillo Wagner Harding, New York City for plaintiff Builders Transport, Inc.

Frank G. Jones, Jeff Cody, Fulbright & Jaworski, L.L.P., Dallas, TX, for defendant The Insurance Company of the State of Pennsylvania.

### MEMORANDUM OPINION AND ORDER GRANTING MOTION OF BUILDERS TRANSPORT, INC. FOR SUMMARY JUDGMENT AND DENYING MOTION OF INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA FOR SUMMARY JUDGMENT

JOE J. FISHER, District Judge.

In this diversity action, the Court is asked to examine the terms of an umbrella insurance policy and determine the extent of the insurer's liability to contribute to the cost of defense. Even though the carrier paid $13–million of $16.3–million in settlements made on the eve of trial, it claims its coverage for such costs is limited to those incurred from the date underlying coverage was exhausted, which because settlement was made in two parts, is a period of just 18 days. The

parties agree that the dispute over liability can be resolved summarily, and each has therefore filed its own motion for summary judgment pursuant to Fed.R.Civ.P. 56(c). For the reasons set forth below, I conclude that the insurer is obligated to contribute, on a pro rata basis, toward all of the costs of defending its insured, including those costs incurred before the limits of underlying coverage were exhausted.

## I.

The following facts are undisputed. Builders Transport, Inc. ("Builders" or the "Company") is a public company, whose stock is traded over the counter under the symbol "TRUK". It owns and operates a fleet of trucks that transport freight throughout all parts of the United States except the far west. Headquartered in Camden, South Carolina, it is currently the eighth largest trucker in the country. (Affidavit of Stanford Dinstein, sworn to November 17, 1997), ¶ 2 (hereinafter referred to as "Dinstein Aff."). The Insurance Company of the State of Pennsylvania ("ISOP") is a Pennsylvania insurance company with its principal place of business in New York (Third Amended Complaint, ¶ 5, Ex. "F"). It is a subsidiary of the American International Group ("AIG"), and is a member of the AIG group of companies. (*Id*).

Builders maintained a three-tiered structure to cover any loss resulting from a motor vehicle accident involving its fleet (Dinstein Aff., ¶ 7). The first $1–million arising from a collision was covered by the Company's self-insured retention ("SIR"), and required that Builders pay all claims, including fees and expenses, for losses under that amount (Dinstein Aff., ¶ 5). The Company then secured coverage from Planet Insurance Co. ("Planet") for the next $1–million of loss (Dinstein Aff., ¶ 6).

With respect to claims that reached the Planet layer of insurance, the Planet policy provided that costs, expenses and fees were to be pro-rated, each party to share such amounts in proportion to what it contributed to a final settlement or verdict. In pertinent part, Endorsement 18 of the Planet policy states:

> In the event that any claim[s], exceed the Named Insured's self-insured retention and involve the liability of the Company, then, solely as respects each such claim, the Company and the Named Insured *shall pro rate all costs and expenses in direct proportion to the amount of damages applicable to and payable by each of them* . . . (emphasis added)

To provide further protection against a catastrophic loss, Builders then purchased from ISOP $13–million in excess coverage. Under its policy, ISOP was obligated to provide the following liability coverage:

> To pay on behalf of the Insured that portion of the Ultimate Net Loss *in excess of the retained limit* as hereinafter defined, which the Insured shall become legally obligated to pay as damages to third parties for liability imposed upon the insured by law, or liability assumed by the insured under contract because of (i) personal injury, (ii) property damage, or (iii) advertising liability as defined herein, caused by an occurrence as defined and/or restricted in this policy. (emphasis added) [1]

The personal injury claims from which the fees and expenses at issue here were incurred arose from a multi-vehicle collision in Texas on November 25, 1993 (Dinstein Aff., ¶ 10). Two people died in the accident, and several others suffered catastrophic permanent injuries (Dinstein Aff., ¶ 10). It was clear from the outset that all three layers of Builders' coverage would likely be invoked and then exhausted (See e.g., Dinstein Aff., Exs. "J", "K" and "L").

As a consequence of the collision, suit was brought against Builders in the District Court of Texas, Jefferson County, captioned *Clancy, et. al. and Chandler v. Builders Transport, Inc.,* Cause No. B–144, 840–B (Dinstein Aff., Ex. "C"). The case was settled in two parts shortly before trial began in June 1995. The first portion of the settle-

---

1. The Court notes that the ISOP policy does not contain any language limiting or restricting the term "all costs", as ISOP now suggests, to only those costs incurred *after* Planet paid out its policy limits.

ment was a payment of $13.8–million to the Clancy plaintiffs made on June 9, 1995 (Dinstein Aff., ¶ 15). The remainder of the case was settled for $2.5–million on June 27, 1995 (Dinstein Aff., ¶ 16), with Builders contributing an additional $1.3–million over and above its SIR and insurance coverages.[2] ISOP claims it is liable only for those costs and fees incurred during the 18 days between June 9, 1995, the date of the settlement with the Clancy plaintiffs, and June 27, 1995, the date its policy limits became exhausted,[3] and nothing more. When Builders demanded that ISOP pay its proportionate pro rata share of all costs and fees incurred in connection with the underlying action, the insurer refused and this case ensued.

## II.

With respect to payment of costs and expenses incurred in connection with a covered loss, Builders claims that Endorsement 17 of the ISOP Policy incorporates by reference the terms of the Planet policy by stating:

[S]hould applicable underlying insurance(s) become exhausted by payment of covered claims, this insurance will continue in force as *underlying insurance* and shall defend any suit arising out of a covered occurrence. (emphasis added)

Builders claims the term "underlying insurance" in the foregoing endorsement is a defined term, since the Planet policy is expressly listed in Endorsement 19 of the ISOP policy as "underlying insurance". Builders further points out that the subject language is found under the heading *Defense, Settlement and Supplementary Payments,* and not in either the coverage section or the separate definition of "Ultimate Net Loss," thereby rendering the section separately applicable once the ISOP policy attaches. By incorporating by reference the Planet policy into the Defense section of its own policy, Builders alleges that ISOP incorporated by reference the portion of the Planet policy that requires defense costs to be prorated "in direct pro-

portion to the amount of damages applicable to and payable by each of them."

Builders further charges that ISOP relied on and benefitted from the legal work provided by counsel retained in defense of the underlying case in deciding to reach a settlement, and attaches documents to support that conclusion (see, e.g., Dinstein Aff., Exs. "J" and "L"). Therefore, Builders says ISOP actually used those services and should be required to pay for them even if the Planet policy is not found to have been incorporated as alleged.

In opposition, ISOP essentially argues that by failing to use the words "follow form", the language in its own policy cannot effectuate an incorporation by reference. Therefore, according to the insurer, its liability for costs and fees does not begin until all underlying insurance has been exhausted, and liability under its own policy attaches. ISOP says the date underlying insurance became exhausted was when the first portion of the settlement was reached on June 9, 1995.

## III.

Summary judgment is warranted if the movant establishes there is no genuine dispute as to any material fact and it is entitled to judgment or partial judgment as a matter of law. Fed.R.Civ.P. 56(c); *Thomas v. Harris County,* 784 F.2d 648 (5th Cir.1986); *Slaughter v. Southern Talc Co.,* 949 F.2d 167 (5th Cir.1991). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has pointed out the absence of evidence supporting the nonmov-

---

**2.** Though not at issue in this motion, which is limited to liability only, Builders claims that approximately $1.4–million in costs and fees were incurred in defending the underlying case (Dinstein Aff., ¶ 17). It has already settled with Plan-

et, and recovered damages from its insurance broker (Dinstein Aff., ¶ 20).

**3.** ISOP estimated at oral argument that amount to be approximately $50,000.

ing party's case, the nonmoving party's failure to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue as to material fact exists. *Saunders v. Michelin Tire Corp.*, 942 F.2d 299 (5th Cir.1991). When considering the propriety of a grant of summary judgment in cases involving the construction of insurance policies, the court may also determine whether applicable policy terms are ambiguous. *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 1988 Tex.App. LEXIS 2285 (1988) The determination of ambiguity is a question of law; "it is only through resolution of ambiguities through the resort to extrinsic evidence which creates a question of fact." *Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Insurance Co.*, 832 F.2d 1358 (5th Cir.1987). Inasmuch as this action involves the interpretation of an insurance contract, it is ripe for summary judgment.

## IV.

■ There is no choice of law provision in the ISOP policy, which covers claims worldwide. In diversity actions, a federal court must follow the choice of law rules of the state in which it sits. *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 205 (5th Cir.1996); *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Texas choice of law principles, contract disputes are governed by the law of the state with the "most significant relationship" to the case. *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (1984). The facts here support reliance on the law of Pennsylvania.

■ ISOP is a Pennsylvania company organized and existing under the laws of the Commonwealth of Pennsylvania (*See* Third Amended Complaint, ¶ 5). That contact is particularly significant, most especially since this dispute neither concerns any Texas companies, nor were any of the subject insurance policies issued and delivered to Texas resi-

dents. It can hardly be deemed unreasonable for ISOP to have expected the laws of the state of its incorporation to apply to disputes involving construction of its insurance policies. *See, e.g., TPLC, Inc. v. United National Insurance Co.*, 44 F.3d 1484, 1491 (10th Cir.1995) ("Pennsylvania has the most significant relationship to the contract and the greatest interest in seeing that its laws apply when interpreting the notice provisions of insurance contracts written and issued by Pennsylvania insurers. It simply would not make sense to have United's insurance contract notice provisions interpreted in fifty different ways every time a dispute arose between United and one of its insureds").[4]

The Court is mindful that Texas has an important connection to the issues raised since the underlying case was brought here, and the attorneys fees at issue were incurred here. However, the contacts with the insurance dispute itself, and not the underlying case, are the ones that are controlling. *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 888 F.Supp. 1372, 1379 (S.D.Tex.1995); *aff'd*, 78 F.3d 202 (5th Cir.1996). The Court also notes, and counsel for both sides conceded at oral argument, that the laws of Pennsylvania, Texas and New York, the three states with the greatest contacts with this dispute, are all in accord insofar as the issues before the Court are concerned, so the selection of one of those state's laws over Pennsylvania would not change the result.

## V.

■ Insurance policies are construed as are contracts generally, and therefore must be interpreted to effectuate the interest of the parties at the time the contracts were formed. *Western Indemnity Insurance Company v. American Physicians Insurance Exchange*, 950 S.W.2d 185 (Tex.App. 1997). When the policy language is unambiguous, the words are to be given their plain, ordinary and generally accepted meaning. *See Puckett v. United States Fire Insurance Co.*, 678 S.W.2d 936, 28 Tex.Super.

---

4. Contrary to ISOP's view, Article 21.42 of the Texas Insurance Code does not require application of Texas law. Article 21.42 does not apply to insurance contracts written by non-Texas in-

surers for non-Texas insureds. *Austin Building Co. v. National Union Fire Ins. Co.*, 432 S.W.2d 697, 701 (1968).

55 (1984); *Ranieli v. Mutual Life Ins. Co.*, 271 Pa.Super. 261, 413 A.2d 396 (1979). Where the language of an insurance contract is ambiguous, the policy is to be construed strictly against the insurer. *Chen v. Metropolitan Insurance and Annuity Co.*, 907 F.2d 566 (5th Cir.1990) ("Even if the insurer's construction is more reasonable than the insured's, the insured's must prevail"). This requirement is even more stringent where the issue is an exception or limitation on an insurer's liability under a policy. *Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 765 (3d Cir.1985) ("where an exclusion is not prominently displayed and not clearly worded, it may be strictly construed against the insurer"); *Assicurazioni Generali, S.p.A. v. Ranger Ins. Co.*, 64 F.3d 979 (5th Cir.1995). When the language of a policy is susceptible to more than one construction or the language is patently ambiguous, the policy should be construed strictly against the insurer and liberally in favor of the insured. *Western World Ins. Co. v. Reliance Ins. Co.*, 892 F.Supp. 659, 662 (M.D.Pa.1995) ("We read the policy with an eye toward avoiding ambiguity and take care not to torture policy language to create uncertainties where none in fact exist ... Ambiguities are resolved in favor of the insured and in a manner consistent with his or her reasonable expectations when contracting for coverage"); *Adams v. John Hancock Mutual Life Insurance Company*, 797 F.Supp. 563 (W.D.Tex.1992), *aff'd*, 49 F.3d 728 (5th Cir.1995).

■ The general rule of interpreting ambiguous terms against the insurer also applies in connection with defense costs. *Aetna Fire Underwriters Insurance Co. v. Southwestern Engineering Co.*, 626 S.W.2d 99 (Tex.App.1981); *Bituminous Casualty Corporation v. Vacuum Tanks, Inc.*, 75 F.3d 1048 (5th Cir.1996).

5. ISOP claims its position as an "umbrella" insurer, as distinct from a pure "excess" insurer, should impact upon the Court's decision. However, no authority for that proposition has been cited, and the Court does not consider that distinction relevant to its determination.

6. Black's Law Dictionary, p. 113 (Sixth Edition) (1990).

## VI.

■ In Pennsylvania, Texas and New York, the determination of whether an excess or umbrella insurer [5] is liable for a proportionate share of all costs and fees incurred in defending an insured begins with an examination of the various layers of coverage, and the specific language of the policies themselves. Courts require pro-rata sharing of defense costs where, as here, the language of the excess or umbrella policy incorporates by reference a proration of costs and fees provision contained in an underlying policy.

■ The ISOP policy here specifically provides that once underlying coverages are exhausted, "this insurance will continue in force *as underlying insurance* and shall defend any suit arising out of a covered occurrence" (Endorsement 17, page 1) (emphasis added). ISOP's strained interpretation of its own policy language renders the phrase "as underlying insurance" meaningless. It ignores that "underlying insurance", by virtue of Endorsement 19 of its own policy, means for purposes of this case the Planet policy itself. Likewise, the term "as" is commonly understood to mean "like, similar to, of the same kind, in the same manner, in the manner in which," [6] or "in the same manner that"; according to the way that ... a correlative construction used to indicate the equality or sameness of two things; *as large as, as heavy as, as many as*, etc.[7]

■ Given its plain meaning, then, the phrase *"as underlying insurance"*, when used in the context chosen by ISOP in the defense portion of its own policy, can only mean that upon the exhaustion of underlying coverages, the ISOP policy will defend *in the same manner as or according to the way that* the underlying Planet policy operated, and that it will provide coverage for expenses *to the same degree in which* that policy did.[8]

7. Webster's New Twentieth Century Dictionary, Unabridged, p. 107 (Second Ed.) (1983).

8. ISOP also argues that Builders should be estopped by allegations made in several claims for relief contained in prior pleadings from claiming the ISOP policy provided proportionate pro-rata coverage for defense costs. However, each pleading also contained a separate count seeking

Since the Planet policy specifically provides for a pro-rata sharing of defense costs by all contributors to the settlement of a claim, once underlying coverages became exhausted and the ISOP policy attached, ISOP also became liable for its proportionate pro rata share of all costs incurred in the defense of Builders in the underlying action, and not just those incurred from the date of exhaustion of those coverages forward.[9]

The case of *General Accident Insurance Company of America v. Safety National Casualty Corporation,* 825 F.Supp. 705 (E.D.Pa.1993), relied on by Builders, is directly on point. In *General Accident* the Court found a duty on the part of an excess carrier in the same position as ISOP to share proportionately all expenses, including those incurred before underlying coverages were exhausted. Safety National had provided up to $25–million of excess coverage to the law firm of Blank, Rome, Comisky & McCauley. Its coverage was excess to, in pertinent part, the primary coverage of General Accident Insurance Company of America. The underlying claims arose from the failure of a Florida S & L and, pursuant to a settlement agreement reached among the parties, each insurer tendered its policy limits. At issue in the case was excess carrier Safety National's obligation to contribute to General Accident Insurance Co. its pro-rata share of defense costs incurred in connection with the underlying claims.

As the ISOP policy here, the Safety National policy incorporated by reference the defense obligations set forth in the underlying General Accident Insurance Co. coverage which "provide[d] for a *pro rata* sharing of defense costs between insurers." The Court noted:

> The plain meaning of the presence of this clause, *incorporated by reference into Safety National's policy,* is that Safety National's defense obligations are contingent upon the exhaustion of General Acci-

dent's primary policy limits and limited to a *pro rata* share. *As General Accident's policy limits were exceeded and the contingency satisfied, it follows that Safety National is obligated to contribute a pro rata share of the costs of defending Blank Rome.*

*Id.,* 825 F.Supp. at 709 (emphasis added):

The District Court rejected the very argument advanced by ISOP here that the "liability" section of the policy controlled the date when the obligation to pay costs and attorneys fees began. It observed:

> Explaining for what Safety National will be liable, this clause makes clear that the "attaches" clause referred to by Safety National is temporal only and that any attaching liability will require Safety National to *indemnify* Blank Rome for amounts in excess of the underlying policy limits, up to certain dollar values. It says nothing, however, about the nature of Safety National's duty to defend. The defense obligation and defense cost apportionment clauses incorporated into Safety National's policy address the extent of this duty, and, as stated above, limit liability to Safety National's *pro rata* share of defense costs, contingent upon exhaustion of underlying policy limits. *There is no indication that Safety National intended to limit its liability only to those costs incurred after the underlying policy limits were exhausted.* Indeed, just the opposite is conveyed by the incorporated presence of the apportionment clause, which states that the insurer "shall be obligated to pay that proportion of claim expenses [defense costs] as the amount of damages bears to the total amount of damages." *Thus when the defense costs were incurred, either before or after policy limits were exceeded, is irrelevant.*" (emphasis added)

*Id.,* 825 F.Supp. at 709–10.

Likewise here, ISOP provided in its policy that upon liability "attaching", it will defend

---

a declaration that such coverage was indeed bound (*See* First Amended Complaint, ¶¶ 71–74; Second Amended Complaint ¶¶ 71–74). It is well settled that a party may plead in the alternative, even when those counts are inconsistent. *See* Fed.R.Civ.P. 8(e); *Fredonia Broadcasting Corp., Inc. v. RCA Corp.,* 481 F.2d 781 (5th Cir. 1973).

9. If that was intended by the insurer as the intent of the defense portion of Endorsement 17 of the ISOP policy, as ISOP now claims, one would think it would have said so in plain language.

the claim "as underlying insurance." Accordingly, once its policy was triggered, ISOP was required to *defend* the claim *on the same terms* as the underlying insurer. Since the "underlying insurance" here contains a requirement that defense costs be shared on a pro-rata basis, ISOP assumed that liability once its policy attached. "Thus, when the defense costs are incurred, either before or after policy limits were exceeded, is irrelevant." *Id.*, 825 F.Supp. at 710. *Cf., Hartford Accident & Indemnity Co. v. Pacific Employers Insurance Company*, 862 F.Supp. 160 (S.D.Tex.1994) (Hartford Accident & Indemnity, which provided the uppermost tier of coverage, subrogated to the rights of Baylor University, the insured and first layer SIR, and afforded recovery from primary insurer of all fees paid up to the time primary's policy limit was exhausted and its insurance obligations satisfied).

Similarly, in *St. Paul Mercury Insurance Co. v. Lexington Insurance Co.*, *supra*, 78 F.3d 202 (5th Cir.1996), a dispute arose among two primary and two excess carriers concerning their respective obligations for costs incurred in an underlying suit. The Court looked first to the language of each insurance contract to see whether and to what extent the excess carriers adopted policy terms of the primary carrier. It found:

St. Paul's policy incorporates Centennial's escape clause. Even though St. Paul's policy does not independently contain an "other insurance" clause, the policy includes a "following form" provision, which states that *the policy is to '[f]ollo[w][the] terms and conditions of [Centennial's] insurance* ... Accordingly, the district court correctly concluded that *all the provisions in the Centennial policy which are not in direct conflict with a provision in the St. Paul policy, including the escape type 'other insurance' clause, are to be considered part and parcel of the St. Paul policy.* (emphasis added)

*Id.*, 78 F.3d at 206.[10]

ISOP relies almost exclusively on *Texas Employers Insurance Association v. Underwriting Members of Lloyds*, 836 F.Supp. 398 (S.D.Tex.1993). However, the facts of that case are distinguishable. First, consistent with the cases cited by Builders, the Court began its analysis by examining the actual language used in the policies at issue. However, unlike here, in *Texas Employers*, it observed that the underlying policy contained no proration clause, and indeed, provided to the contrary; that the underlying insurer would pay for all costs and fees itself. In addition, the excess carriers expressly disclaimed coverage for such amounts.[11] It stated:

**10.** *See also National Grange Mutual Insurance Co. v. Continental Casualty Ins. Co.*, 650 F.Supp. 1404 (S.D.N.Y.1986) (both primary and excess insurer was obligated to contribute, pro rata, in proportion to their respective undertaking toward legal fees and other expenses of litigation); *Millers' Mutual Ins. Assoc. of Illinois v. Iowa National Mutual Ins. Co.*, 618 F.Supp. 301 (D.Col.1985) (primary and excess insurers held liable for a share of defense costs in proportion to the amounts of policy because "equity will not permit excess carrier the windfall of having its defense obligations discharged by the primary insurer"); *Coastal Iron Works, Inc. v. Petty Ray Geophysical*, 783 F.2d 577 (5th Cir.1986) (primary and excess carriers must share litigation costs where insured was only required to pay amount of primary policy); *General Accident Insurance Company of America v. Safety National Casualty Corporation*, 825 F.Supp. 705 (E.D.Pa. 1993); *Pallotta v. Aetna Ins. Co.*, 66 Misc.2d 929, 322 N.Y.S.2d 921 (N.Y.Sup.1971) (excess carrier may be required to share costs of defense); *American Fidelity Ins. Co. v. Employers Mutual Casualty Co.*, 593 P.2d 14, 22, 3 Kan.App.2d 245 (1979) ("Under general principles of equitable

subrogation" where the same risk is covered by both primary and secondary insurance, both are liable for a pro rata share of the costs of defense); *Celina Mutual Ins. Co. v. Citizens Ins. Co. of America*, 349 N.W.2d 547, 133 Mich.App. 655 (1984) (where excess insurer knew that the primary coverage would be exhausted, it was obligated to pay pro rata share of defense costs based on the amount of settlement it was required to pay); *Aetna Casualty & Surety Co. v. Certain Underwriters at Lloyds of London*, 56 Cal. App.3d 791, 129 Cal.Rptr. 47 (Cal.App.2d Dist. 1976) (excess carriers required to share in defense costs based on proration of each insurer's share of total paid out in claims).

**11.** The primary policy expressly provided, *inter alia*, that Texas Employers was required to "pay all expenses incurred by the company, all costs taxed against the insured ... until the company has paid or deposited in court such part of such judgment as does not exceed the limit of the company's liability." In contrast, the excess coverage provided that the "Underwriters shall not be called upon to assume charge of the settle-

[T]he policies *make no reference as to how legal fees or costs should be prorated.* Assuming *arguendo* that TEIA is correct and that the policies somehow call for proration of costs incurred before the exhaustion of the underlying policy limits, *neither the primary nor the excess policies provides any guidance as to how such costs should be apportioned. The absence of any such provisions further suggests that such apportionment was never contemplated . . . Given the absence of any contractual basis from which to infer any obligation* on the part of the excess carrier, the Court concludes that under these facts Texas would follow the majority rule and hold that an excess insurer is not obligated to participate in the costs of defense until the primary policy limits are exhausted. (emphasis added).

Given the Court's careful analysis in *Texas Employers* of the excess and underlying policies themselves, it appears certain that had the underlying policy not only provided for the proration of costs, but, as here, also been incorporated into the excess policies by reference, the *Texas Employers* court would have reached a different result. *See St. Paul Mercury,* 78 F.3d at 209 (issue was excess insurers' relative obligations for cost of insured's settlement); *Emscor Mfg. Inc. v. Alliance Ins. Group,* 879 S.W.2d 894, 903 (Tex. App.—Hous. 14th Dist.1994) (issue was when an excess carrier must make its coverage available in a settlement when the insured's primary liability insurer became insolvent); *Utica Nat'l Ins. Co. of Texas v. Fidelity & Casualty Co. of New York,* 812 S.W.2d 656, 662 (Tex.App.—Dallas 1991) (court ordered pro-rata contribution to liability where neither of two different lines of insurance acknowledged the existence of the other); *Westchester Fire Ins. v. Heddington Ins. Ltd.,* 883 F.Supp. 158, 164 (N.D.Tex.1995); *Aff'd,* 84 F.3d 432 (5th Cir.1996) (loss prorated between two excess insurers where policies had conflicting other insurance clauses).

■ Here, there is a contractual basis from which to infer the obligation to share

costs and fees. The Court rejects ISOP's argument that only the specific words "follow form" can be used to achieve an incorporation by reference of a proration of costs and fees provision from an underlying policy, and ISOP has pointed to no authority for such a proposition. Words of similar import, as used by the insurer here, will suffice. *See St. Paul Mercury Ins. Co. v. Lexington Ins. Co., supra,* 888 F.Supp. at 1378.

ISOP incorporated by reference, and thereby adopted, the pro-rata sharing provision for costs and expenses contained in the Planet policy. Any other more restrictive interpretation would render meaningless its use of the phrase "continues in force *as underlying insurance*" in the "defense costs" section of ISOP's own policy. If coverage "continues . . . as underlying insurance," it must, by necessity, be on the same terms as the underlying insurance referred to.

■ Likewise, the refusal of ISOP to contribute its proportionate pro-rata share of all costs incurred to defend Builders in the underlying action was without justification, and was a breach of its insurance agreement. Indeed, its offer of a paltry $50,000 toward those costs for a limited 18 day period, most especially in light of the uncontroverted proof that it relied on the services provided by the lawyers in the underlying case in deciding to tender its $13–million policy limits, cannot be excused. Accordingly, Builders may also recover from ISOP its reasonable costs and attorneys fees incurred in connection with this action as an additional element of reasonable and consequential damages arising from ISOP's breach of the insurance contract.

### CONCLUSION

For the foregoing reasons, the motion by Builders for summary judgment on the issue of liability is granted, and the motion of ISOP on the issue of liability is denied. Builders is entitled to recover from ISOP, in the manner set forth in Endorsement 18 of

ment or defense of any claim made or suit brought or proceeding instituted against the As-

sured." *Id,* at 406.

the Planet policy, ISOP's proportionate pro-rata share of all costs and fees incurred in the defense of Builders in the underlying action, plus interest from November 14, 1995 (*see*, Dinstein Aff., Ex. Q), whether such fees were incurred prior to or after liability under its umbrella policy attached. This matter should be set for trial forthwith to determine the amount of damages, including costs and attorneys fees incurred connection with this action, to which Builders is entitled.